OPINION OF THE COURT
Hancock, Jr., J.

People v Scott

 In Oliver v United States (466 US 170) the Supreme Court fully reaffirmed the doctrine articulated in Hester v United States (265 US 57): that in areas outside the curtilage, an owner of "open fields” enjoys no Fourth Amendment protection. This is so, the Oliver majority held, even for secluded lands and notwithstanding efforts of the owner to exclude the public by erecting fences or posting "No Trespassing” signs. In this appeal by defendant from a conviction for illegally growing marihuana on his land, we address the question expressly left open in People v Reynolds (71 NY2d 552): whether the Supreme Court’s categorical ruling in Oliver should be adopted as the law of this State under article I, § 12 of the New York State Constitution. For reasons which follow, we hold that the Oliver ruling does not adequately protect fundamental constitutional rights (see, People v P. J. Video, 68 NY2d 296, 303-306) and we decline to adopt it. There should, therefore, be a reversal.
I
Defendant was convicted on his guilty plea in County Court of criminal possession of marihuana in the first degree. The plea followed the denial of. defendant’s motion to suppress the evidence of marihuana cultivation seized by State Police on the execution of a search warrant. The Appellate Division unanimously affirmed in a memorandum agreeing with County Court’s conclusion that "defendant’s act of posting no trespassing signs about every 20 to 30 feet around the perimeter of his property, which consisted of 165 acres of rural, hilly, *479 undeveloped, uncultivated fields and woodlands except for defendant’s cultivation of marihuana thereon, [did not establish] an expectation of privacy cognizable under the right to privacy protection of the 4th Amendment of the US Constitution and article I, section 12 of the NY Constitution” (People v Scott, 169 AD2d 1023, 1024).
The relevant facts upon which County Court denied suppression following the hearing are not in dispute. On August 23, 1988, the New York State Police with assistance from the Chenango County Sheriff’s Department, executed a search warrant on property owned by the defendant. The application for the warrant included the "in camera” testimony of William Collar, a private citizen, who in the fall of 1987 had shot and wounded a deer and followed it onto defendant’s property. He observed what appeared to be the remnants of a marihuana growing operation. When Collar entered the property again in July of 1988, he testified, he saw approximately 50 marihuana plants under cultivation. He reported this information to the State Police who requested that he obtain a leaf from one of the plants on the property. Collar did so. On August 22, 1988, Investigator Leslie Hyman of the State Police accompanied Collar to the site where Hyman personally observed the plants. None of the entries by Investigator Hyman or William Collar was with defendant’s knowledge or permission.
In addition to the foregoing, the warrant application contained tax maps showing that the property belonged to defendant and a report of an anonymous telephone tip to the effect that defendant was growing marihuana on the property. The hearing court found that the property "was conspicuously marked with No Trespassing signs clearly visible and indeed observed by not only the confidential informant [William Collar] but the police units entering the property.” The residence consisted of a mobile home with no utilities located near County Route 19, a two-lane road in the Town of Preston. The marihuana plants were not found within the curtilage of defendant’s mobile home but some 300-400 yards away.
In denying the motion to suppress, the hearing court relied on the rationale of Oliver v United States (supra) and held that the "intrusion by the confidential informant and police officer did not in any way infringe upon any of the personal or societal values that the Fourth Amendment was designed to protect against or article I section 12 of the State Constitution was designed to protect against.”
*480 The Appellate Division, in its affirmance, concluded that the "open fields doctrine upheld in Oliver is followed in New York” (id., at 1025), citing its prior decision in People v Joeger (111 AD2d 944) and our decision in People v Reynolds (71 NY2d 552, 556). The Appellate Division reasoned that inasmuch as the "marijuana * * * was clearly grown in an open, uncultivated field away from the curtilage of any residential structure * * *, defendant had no legitimate expectation of privacy” (id., at 1025). Because defendant had no right of privacy under Oliver, it was of no moment, in the Court’s view, whether Collar had become an agent of the police in reentering the property at their direction (id., at 1025-1026). Defendant has appealed by leave. We now reverse.
II
There is nothing in People v Reynolds (supra) which inhibits our rejection of Oliver if we are persuaded that the proper safeguarding of fundamental constitutional rights requires that we do so (see, e.g., People v P. J. Video, supra, at 303-306). In Reynolds, the Court pointed out that defendant made no claim that her property was bounded by fencing or marked by signs warning against trespass. Accordingly, it expressly declined to address the question of whether such obvious manifestations of an intention to exclude the public could — contrary to the Supreme Court’s holding in Oliver — create an expectation of privacy cognizable under article I, § 12 of our State Constitution (see, People v Reynolds, supra, at 556, 557, 558; see also, id., at 559, 562-563 [Hancock, Jr., J., dissenting]).
Nor, contrary to the People’s argument, is there any inconsistency in our adopting a more protective rule under our State Constitution in the present case than in our prior decisions involving rights protected by article I, § 12 (see, e.g., People v Keta, majority opn, at 495-496, 496-497; People v Dunn, 77 NY2d 19, 24-25 [holding canine sniff to be an invasion of defendant’s expectation of privacy under art I, § 12]; People v Torres, 74 NY2d 224, 227 [rejecting Supreme Court’s expansive view of "stop and frisk” procedures as applied to automobiles]; Matter of Patchogue-Medford Congress of Teachers v Board of Educ., 70 NY2d 57, 65-69 [holding that mandatory drug testing of teachers constituted an illegal search in violation of teachers’ rights of personal privacy protected by NY Const, art I, § 12]; People v P. J. Video, 68 NY2d 296, 303-309, supra [requiring standards more exacting than those demanded by Supreme *481 Court for issuance of search warrant for videotapes as evidence in obscenity prosecution]; People v Class, 67 NY2d 431, 433 [adhering on remand to earlier holding (see, People v Class, 63 NY2d 491, 494) that noneonsensual entry of automobile by police to inspect VIN number violated defendant’s legitimate expectation of privacy under NY Constitution, article I, § 12 (citing, inter alia, Katz v United States, 389 US 347)]; People v Gokey, 60 NY2d 309, 312; People v Gleeson, 36 NY2d 462; see also, People v Millan, 69 NY2d 514, 519-522, n 7; People v Stith, 69 NY2d 313, 316; People v Johnson, 66 NY2d 398, 407; People v Bigelow, 66 NY2d 417, 426-427; People v Belton, 55 NY2d 49; People v Elwell, 50 NY2d 231, 234-242).[1]
Ill
In deciding whether our Court should adopt the absolute rule stated in Oliver, that decision must be considered in the light of the Supreme Court’s prior Fourth Amendment holdings. In Oliver, the Court expressly reconfirmed its original "open fields” ruling in Hester v United States (265 US 57, supra), a decision founded on a literal interpretation of the language of the Fourth Amendment. The Hester Court had upheld a warrantless search of a field by Federal agents, declaring that "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,’ is not extended to the open fields” (id., at 59 [emphasis added]). The Court, three years later in Olmstead v United States (277 US 438) — holding that the Fourth Amendment did not apply to wiretap eavesdropping — endorsed Hester’s literal interpretation and introduced the concept that a Fourth Amendment search required an actual trespass into a constitutionally protected area (id., at 463-466). Thus, under the combined holdings of Hester and Olmstead, a warrantless search of land was constitutionally prohibited only if it involved a physical trespass by a government agent into the residence itself or its curtilage.
In 1967, the Supreme Court, in its seminal decision in Katz *482 v United States (389 US 347, supra), abandoned the HesterOlmstead property-oriented, physical trespass approach to its Fourth Amendment jurisprudence and declared that the "Fourth Amendment protects people — and not simply 'areas’ —against unreasonable searches and seizures” (id., at 353). Overruling its earlier eavesdropping and bugging decisions in Olmstead v United States (supra) and Goldman v United States (316 US 129), the Court held that the trespass doctrine of those cases was no longer controlling. Thus, the issue became not whether the telephone booth was a constitutionally protected area which State agents had transgressed, but whether the petitioner’s privacy rights had been violated. The Court concluded that the government’s actions in "electronically listening to and recording the petitioner’s words violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted a 'search and seizure’ within the meaning of the Fourth Amendment” (id., at 353). In what came to be accepted as the Katz "expectation of privacy” formulation, Justice Harlan introduced a two-step analysis: (1) whether the individual has manifested a subjective expectation of privacy from the challenged search; and, (2) if so, whether society would find that expectation objectively reasonable (see, id., at 360-362 [Harlan, J., concurring]).
Seventeen years after Katz, the Court revisited the question of Fourth Amendment protection against warrantless searches on land outside the curtilage in two consolidated appeals decided in Oliver v United States (466 US 170, supra). The search in each case was of land in a secluded area. The cases differed from Hester in one respect. Both landowners had posted "no trespassing” signs. Moreover, in Oliver, the agents had walked around a locked gate. Before the Oliver decision, many had speculated that the Court’s decision in Katz had overruled or substantially limited Hester, inasmuch as Katz had repudiated the rigid property concepts applied in Olmstead and Hester (see, e.g., United States v Oliver, 686 F2d 356 [6th Cir 1982, en banc], dissenting opn, at 365-367; Oliver v United States, supra, at 174, n 3; 1 LaFave, Search and Seizure § 2.4, at 426, and cases cited, nn 17-18 [2d ed]).
In its Oliver decision, the Court put an end to the uncertainty. It reverted to and reinforced the doctrine established in the pre-Katz cases of Hester and Olmstead. After Oliver, it was settled that for land outside of the curtilage an owner was entitled to no Fourth Amendment protection, even for secluded property which has been fenced or posted. As the *483 initial basis for its holding, the Court returned to the literal reasoning of Hester: that because the language of the Amendment referred to the security of the people only "in their persons, houses, papers, and effects”, a warrantless intrusion by State agents on open land was not "proscribed by the text of the Fourth Amendment” (Oliver v United States, supra, at 177).
To obviate the seeming inconsistency between its revival of the strict Hester doctrine and the Katz expectation of privacy approach, the Court held that for the residence and its immediate environs the expectation of privacy rationale would apply. But the Court was faced with the argument that the two-part Katz formulation should logically apply as well to open land which was fenced or posted against trespassers. The Court simply dismissed this argument in its second legal holding: that an owner of such open land could have no expectation of privacy, in any event, because an expectation based on posting or fencing land or planting crops in secluded areas is, as a matter of law, not one that society recognizes as reasonable. In other words, the owner’s claimed privacy expectancy could not pass the second or objective part of the Katz test. The Court held:
"There is no societal interest in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields. Moreover, as a practical matter these lands usually are accessible to the public and the police in ways that a home, an office, or commercial structure would not be. It is not generally true that fences or 'No Trespassing’ signs effectively bar the public from viewing open fields in rural areas. And both petitioner Oliver and respondent Thornton concede that the public and police lawfully may survey lands from the air. For these reasons, the asserted expectation of privacy in open fields is not an expectation that 'society recognizes as reasonable’ ” (id., at 179 [emphasis added]).
Apparently attaching significance to the illegality of activities sought to be kept private (i.e., growing marihuana),[2] *484 rather than the nature of the efforts to assure privacy, the Court held that defendants’ expectations of privacy were not legitimate. The Court’s reasoning follows:
"Initially, we reject the suggestion that steps taken to protect privacy establish that expectations of privacy in an open field are legitimate. It is true, of course, that petitioner Oliver and respondent Thornton, in order to conceal their criminal activities, planted the marihuana upon secluded land and erected fences and 'No Trespassing’ signs around the property. And it may be that because of such precautions, few members of the public stumbled upon the marihuana crops seized by the police. Neither of these suppositions demonstrates, however, that the expectation of privacy was legitimate in the sense required by the Fourth Amendment. The test of legitimacy is not whether the individual chooses to conceal assertedly 'private’ activity. Rather, the correct inquiry is whether the government’s intrusion infringes upon the personal and societal values protected by the Fourth Amendment. As we have explained, we find no basis for concluding that a police inspection of open fields accomplishes such an infringement” (id., at 182-183 [emphasis added]).
In sum, the Oliver rule is absolute: in land outside the curtilage the owner has no constitutionally protectible interest. Regardless of steps taken to assure privacy, such as *485 posting or erection of fences, and irrespective of the benign nature of the activities sought to be kept private,[3] the police may enter without a warrant.
IV
In considering whether the Oliver rule should be adopted as New York law, we note that the Oliver majority’s holding that the Amendment covers persons, houses, papers and effects— but not land — seems directly contrary to the basic concept of post-Katz decisions that the Amendment protects a person’s privacy, not particular places (see, e.g., United States v Chadwick, 433 US 1, 7 [defendants’ rights held to be infringed by a police search of container in automobile upon the ground that "the Fourth Amendment 'protects people, not places,’ Katz v. United States, 389 U.S. 347, 351 (1967); more particularly, it protects people from unreasonable government intrusions into their legitimate expectations of privacy”];[4] Smith v Maryland, 442 US 735, 740, and cases cited). Justice Marshall’s dissent in Oliver points up the inconsistency between the majority’s restricted reading of the Amendment’s language and the Katz holding that a telephone conversation is protected under the Fourth Amendment although "neither a public telephone booth nor a conversation conducted therein can fairly be described as a person, house, paper, or effect” (Oliver v United States, supra, at 185 [emphasis added]; id., at 185-188; see also, Marshall v Barlow’s, Inc., 436 US 307, 311 [holding that business premises are protected although not covered by the *486 plain language of the Amendment]; G. M. Leasing Corp. v United States, 429 US 338, 358-359 [same]). While we agree with Justice Marshall’s dissent as to these evident contradictions, we find the Oliver majority’s literal interpretation of the Amendment’s language and its reliance on history to support it, to be of little relevance, in any event (see, e.g., the majority’s reference [Oliver v United States, supra, at 176-177] to the rejection of James Madison’s proposed draft which had included "other property” in addition to "persons”, "houses”, and "papers”). For we are concerned here with a provision in a different Constitution with its own unique history.
As pointed out in P. J. Video (68 NY2d, at 304, n 4, supra), the guarantee against unreasonable searches and seizures found in article I, § 12 was originally contained in a New York statute (Civil Rights Law §8); it was not added to the State Constitution until 1938. The available constitutional history is sparse and provides little guidance (see, Titone, State Constitutional Interpretation: The Search for an Anchor in a Rough Sea, 61 St John’s L Rev 431, 462-466). It should be noted, moreover, that the texts of article I, § 12 and the Fourth Amendment are not the same. The New York provision contains a clause not found in the Fourth Amendment (see, NY Const, art I, § 12, 2d para [providing protection against interception of telephone and telegraph communications, contrary to the now obsolete rule of Olmstead v United States (supra)]; Berger v New York, 388 US 41, 46).
Thus, the significant question before us does not pertain to the Oliver majority’s first basis for its holding — i.e., its literal textual analysis of the Amendment. The question is whether we should adopt the Court’s second ground for its decision and its basis for not applying the Katz test to open land: the categorical holding that an expectation of privacy in land outside the curtilage (manifested by posting or erecting fences) is not one which society is prepared to recognize as reasonable. We believe that under the law of this State the citizens are entitled to more protection. A constitutional rule which permits State agents to invade private lands for no reason at all —without permission and in outright disregard of the owner’s efforts to maintain privacy by fencing or posting signs — is one that we cannot accept as adequately preserving fundamental rights of New York citizens. Such a rule is contrary to New York decisions, particularly those adopting the Katz rationale in séarch and seizure cases. It is also incompatible with Justice Brandéis’ Olmstead dissent declaring the "right to be *487 let alone — the most comprehensive of rights and the right most valued by civilized men” (Olmstead v United States, supra, at 478) — a core principle reflected in our cases vindicating a broader privacy right in areas other than search and seizure (see, e.g., Matter of Doe v Coughlin, 71 NY2d 48, 52-53; People v Onofre, 51 NY2d 476, 485-488; Rubenfeld, The Right of Privacy, 102 Harv L Rev 737, 745, n 47).
It is true that not every property right entails a protectible privacy interest. Nevertheless, "property rights reflect society’s explicit recognition of a person’s authority to act as he wishes in certain areas, and therefore should be considered in determining whether an individual’s expectations of privacy are reasonable.” (Rakas v Illnois, 439 US 128, 153 [Powell, J., concurring].) That a landowner has a legal right to exclude the public is recognized in the sections of New York’s Penal Law dealing with offenses involving damage to and intrusion upon property (see, Penal Law art 140, particularly § 140.05 [trespass], and § 140.10 [a] [criminal trespass in the third degree] [unlawful to remain upon real property which is fenced or otherwise enclosed in a manner designed to exclude intruders]; see also, Model Penal Code and Commentaries § 221.2, at 87 [1980]). This "power to exclude has traditionally been considered one of the most treasured strands in an owner’s bundle of property rights” (Loretto v Teleprompter Manhattan CATV Corp., 458 US 419, 435; see, Seawall Assocs. v City of New York, 74 NY2d 92, 102-106; Holmes, The Common Law, at 208-214, 244-246).
Our Legislature has recognized the owner’s right to prohibit entry on land in the posting provisions of the Environmental Conservation Law (see, ECL 11-2111, 11-2113, 71-0925, 71-0919) and in General Obligations Law § 9-103, enacted for the purpose of dissuading landowners from posting their property and encouraging them to admit the public (see, Ferres v City of New Rochelle, 68 NY2d 446, 452-454). Despite the People’s urging, we do not dismiss so lightly the fact that the police were violating defendant’s property rights and committing criminal and civil trespass by entering the land. As Justice Brandéis observed, "Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law” (Olmstead v United States, 277 US, at 485, supra [Brandéis, J., dissenting]). Significantly, our own Court — in suppressing evidence under the Fourth Amendment and article I, § 12 — has ad *488 verted to the illegal conduct of the police in obtaining the evidence through a trespass on private property (see, People v Gleeson, 36 NY2d 462, 464-467, supra).
But it is in the search and seizure cases decided after Katz that it becomes plain that the Oliver majority’s categorical no-protection rule would be mimical to New York law. Our Court, in applying both Federal and State law, has consistently adhered to the concept introduced in Katz: that the Fourth Amendment and article I, § 12 protect the privacy rights of persons, not places (see, e.g., Matter of Seelig v Koehler, 76 NY2d 87, 91-93; id., at 97-98 [Wachtler, Ch. J., dissenting]; and Matter of Patchogue-Medford Congress of Teachers v Board of Educ., 70 NY2d 57, 65-69, supra [both cases discussing the extent of privacy interests protected under article I, § 12 in the context of mandatory urinalysis of employees for drug testing]; see also, cases discussed, part II, supra, at 480-481, particularly, People v Torres, 74 NY2d 224, 227, supra; People v Class, 67 NY2d 431, 433, supra; People v Gokey, 60 NY2d 309, 312, supra). Reverting to the Oliver majority’s pre-Katz, property-oriented approach would subvert New York’s acceptance of article I, § 12 and the Fourth Amendment as affording protection not to places, but to an individual’s legitimate expectation of privacy.
Moreover, we find troublesome, as did Justice Marshall, the Oliver Court’s suggestion that the very conduct discovered by the government’s illegal trespass (i.e., growing marihuana) could be considered as a relevant factor in determining whether the police had violated defendant’s rights (see, Oliver v United States, supra, at 191, n 13 [Marshall, J., dissenting] [quoted, supra, at 483-484, n 2]). Such after-the-fact justification for illegal police conduct would not be compatible with New York’s recognition of fairness as an essential concern in criminal jurisprudence (see, e.g., People v Millan, 69 NY2d 514, 518-520; People v Jones, 70 NY2d 547, 550-553; People v Rosario, 9 NY2d 286, 286-289).
The reasoning of the Oliver majority, seems, to be this, in effect: that law-abiding persons should have nothing to hide on their property and, thus, there can be no reasonable objection to the State’s unpermitted entry on posted or fenced land to conduct a general search for contraband. But this presupposes the ideal of a conforming society, a concept which seems foreign to New York’s tradition of tolerance of the unconventional and of what may appear bizarre or even offensive (see, *489 People ex rel. Arcara v Cloud Books, 68 NY2d 553, 557; People v P. J. Video, supra, at 308-309; Bellanca v New York State Liq. Auth., 54 NY2d 228; People v Onofre, supra, at 487-489). So also does this reasoning ignore the truism that even law-abiding citizens may have good reasons for keeping their activities private (see, Oliver v United States, supra, at 192, n 15 [Marshall, J., dissenting] [quoted, supra, at 485, n 3]), and the general notion that the only legitimate purpose for governmental infringement on the rights of the individual is to prevent harm to others (see, Bowers v Hardwick, 478 US 186, 199, 203-206, 211-213 [Blackmun, J., dissenting]; id., at 217-218 [Stevens, J., dissenting]; People v Onofre, supra, at 486-493; and see, Mill, On Liberty, at 68, 141-162 [Himmelfarb ed, 1985]; see also, Rubenfeld, The Right of Privacy, 102 Harv L Rev 737, 756-757, nn 106, 107). We do not find the Oliver Court’s reasoning acceptable as a justification under article I, § 12 for a nonconsensual governmental search of properly posted or fenced land outside the curtilage.
V
The dissent is remarkable both for what it says, and does not say. Its displeasure is directed not at our determination that certain rights of the defendant require protection under our law but at our decision to afford protection to these rights under the State Constitution. Nowhere does the dissent take issue with the basic proposition that in a free society the police should not be permitted to encroach upon private property against the owner’s will and then to use the fruits of their trespass as incriminating evidence. Its reproaches are aimed instead at our exercise of the authority of the State Constitution to prohibit such unlawful conduct where, as under Oliver, the Federal Constitution fails to do so. The dissent brings into sharp focus divergent views concerning the place of State Courts in our Federal system and the circumstances under which they should act to protect fundamental rights of citizens left unprotected by the Federal Constitution. The views of the dissent on these issues are thoroughly analyzed and answered by Judge Kaye in her concurrence which, in all respects, is adopted here.
In rejecting the Oliver majority’s reversion to a pre-Katz application of the Fourth Amendment based on property concepts and a literal interpretation of its text, we have done so primarily for these reasons: (1) since the Katz decision in *490 1967 our Court, in countless search and seizure cases, has applied the Katz expectation of privacy rational, and to accept Oliver’s return to what was thought to have been the abandoned Hester-Olmstead conception of the Fourth Amendment would be contrary to our post-Katz case law; (2) the rule that an owner can never have an expectation of privacy in open lands is repugnant to New York’s acceptance of "the right to be let alone” (Olmstead v United States, supra, at 478 [Brandéis, J., dissenting]) as a fundamental right deserving legal protection; (3) the unbridled license given to agents of the State to roam at will without permission on private property in search of incriminating evidence is repugnant to the most basic notions of fairness in our criminal law.[5]
These reasons we are convinced, require us to reject Oliver and to turn instead to our State Constitution for the protection of our citizens’ rights. They are certainly as compelling or more so than the reasons which in the past have prompted the Court to resort to article I, § 12 for the adequate protection of fundamental rights (compare, cases cited, supra, at 480-481, particularly, People v Torres, supra; Matter of Patchogue-Medford Congress of Teachers v Board of Educ., supra; People v P. J. Video, supra; People v Class, supra; People v Gokey, supra). For the dissenters, it seems, these reasons are far from enough; for it is obvious that the dissent’s distress is not only with this decision but with the general concept of State constitutionalism.
What would meet the requirements of the noninterpretative method of analysis which we are accused of scuttling (dissenting opn, at 518) is not clear; but we decline to adopt any rigid method of analysis which would, except in unusual circumstances, require us to interpret provisions of the State Constitution in "Lockstep” with the Supreme Court’s interpretations of similarly worded provisions of the Federal Constitution (see, Abrahamson, Criminal Law and State Constitutions: The Emergence of State Constitutional Law, 63 Tex L Rev 1141, at 1166-1168). Fortunately, we believe, our Court has never *491 adopted the "Lockstep” model or any other fixed analytical formula for determining when the proper protection of fundamental rights requires resort to the State Constitution (see, e.g., Abrahamson, Criminal Law and State Constitutions: The Emergence of State Constitutional Law, op. cit., at 1156-1193). Our role, as we see it, is to analyze the particular case and the Federal constitutional rule at issue in the light of considerations such as those discussed by Judge Titone in People v Keta (majority opn, at 496-497, 497 [decided herewith]) in order to determine whether under established New York law and traditions some greater degree of protection must be given. In this case we are convinced that it must be. For, as Justice William Brennan has emphasized, "state courts cannot rest when they have afforded their citizens the full protections of the federal Constitution” and without "the independent protective force of state law * * * the full realization of our liberties cannot be guaranteed” (Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv L Rev 489, 491).
We hold that where landowners fence or post "No Trespassing” signs on their private property or, by some other means, indicate unmistakably that entry is not permitted, the expectation that their privacy rights will be respected and that they will be free from unwanted intrusions is reasonable. In the case at bar, the warrantless entries of State Police Investigator Hyman and of William Collar, acting at the request of the police, were illegal under NY Constitution, article I, § 12. That the property was posted with "No Trespassing” signs is undisputed. The People do not contend— notwithstanding this posting — that defendant permitted others on his land or that, in some other way, he failed to manifest a subjective expectation of privacy. Nor do they claim that the area where the marihuana was allegedly being cultivated was in plain view from a place of public access. The search warrant obtained on the basis of these illegal entries was, therefore, a nullity and the seizure of the evidence discovered upon its execution should have been suppressed.
Accordingly, the order of the Appellate Division should be reversed, the guilty plea vacated, the motion to suppress the evidence granted and the indictment dismissed.
Titone, J.

People v Keta

In New York v Burger (482 US 691), the United States *492 Supreme Court held that Vehicle and Traffic Law § 415-a (5) (a), which authorizes the police to conduct random warrantless searches of vehicle dismantling businesses to determine whether such businesses are trafficking in stolen automobile parts, does not violate the Fourth Amendment’s proscription against unreasonable searches and seizures. This appeal calls upon us to determine whether that provision can likewise withstand challenge under article I, § 12 of our State Constitution. For the reasons that follow, we conclude that it cannot.
I
In February 1988, a five-member team from the Auto Crime Division of the New York City Police Department arrived at a vehicle dismantling operation located in the Maspeth section of Queens to conduct a random warrantless inspection of the premises pursuant to Vehicle and Traffic Law § 415-a (5) (a). Upon their arrival, the members of the team entered the business’s front office, where they identified themselves as police officers and announced that they were present to perform an administrative inspection. Upon the officers’ request, defendant — the owner and operator of the business — produced various New York City permits and his vehicle dismantler’s license. Two of the officers then proceeded to the premises’ yard, where they randomly selected vehicle identification numbers from several auto parts. After entering the numbers into a mobile computer located in their patrol car, the officers discovered that two of the parts were from automobiles which had been reported stolen. Defendant was then ordered to produce his so-called "police book,” in which entries relating to the purchase of vehicle parts were required to be recorded. After it was ascertained that defendant’s "police book” did not contain the required entries pertaining to the stolen parts, defendant was placed under arrest. A detailed search of the premises, subsequently conducted pursuant to a search warrant, revealed some 35 other automobile parts which had also been reported stolen.
Defendant was thereafter charged with, inter alia, multiple counts of criminal possession of stolen property in the third degree. Prior to trial, he moved to suppress the physical evidence which had been seized from his vehicle dismantling business. In support of his motion, defendant argued that section 415-a (5) (a) violated the proscription against unreasonable searches and seizures contained in article I, § 12 of the *493 New York State Constitution. The hearing court agreed and granted defendant’s motion to suppress. On appeal, however, a divided Appellate Division reversed. Noting that the United States Supreme Court had already upheld the statutory provisions for warrantless "administrative” searches of vehicle dismantling businesses against a Fourth Amendment challenge (New York v Burger, 482 US 691, supra), the Appellate Division found no reason to reach a different conclusion under article I, § 12 of the State Constitution. A Justice of the Appellate Division subsequently granted defendant leave to appeal to this Court. We now reverse.
II
The United States Supreme Court has addressed the applicability of the Fourth Amendment to warrantless "administrative” searches on several occasions, with varying results. Initially, the Supreme Court held that the Fourth Amendment’s warrant requirement applied only to searches undertaken to procure evidence of criminality and not to administrative inspections or searches undertaken to implement a regulatory scheme (Frank v Maryland, 359 US 360). The Court, however, abandoned that position in Camara v Municipal Ct. (387 US 523) and See v City of Seattle (387 US 541), holding instead that the Fourth Amendment applies to searches undertaken for regulatory purposes as well as to searches for criminal evidence, although warrants for searches in the former category need not be supported by probable cause in the traditional sense since they "are neither personal in nature nor aimed at the discovery of evidence of crime” (Camara v Municipal Ct., 387 US, at 537, supra).
Shortly after Camara and See were decided, the Supreme Court carved out an exception to the warrant requirement it had established in those cases. In Colonnade Corp. v United States (397 US 72) and United States v Biswell (406 US 311), the Court held that the Fourth Amendment does not demand a warrant for an inspection or search of business premises where the particular industry is subject to close governmental supervision and the authorizing statute prescribes specific procedural rules to govern the manner in which the search is conducted. In a subsequent case, the Court explained that the Colonnade-Biswell exception was a response to "relatively unique circumstances” where "[c]ertain industries have such a history of government oversight that [the proprietor could *494 have] no reasonable expectation of privacy” (Marshall v Barlow’s, Inc., 436 US 307, 313 [emphasis supplied]). Nevertheless, only three years later, the Court substantially broadened the exception, holding that it is not limited to industries having a long tradition of government regulation (Donovan v Dewey, 452 US 594, 605-606). Rather, it is the "pervasiveness and regularity” — not the longevity — of regulation that determines whether a warrant is necessary.
It was against this somewhat perplexing legal backdrop that this Court first considered the constitutionality of Vehicle and Traffic Law § 415-a (5) (a), which requires registered vehicle dismantling businesses to maintain records of the vehicles coming into their possession, authorizes Department of Motor Vehicles agents and police officers to examine such records and, finally, permits warrantless searches of the premises to locate and inspect any items that are subject to the record-keeping requirement.[1] Examining this statute in People v Burger (67 NY2d 338), we held that it, as well as the analogous provisions of New York City Charter § 436,[2] violated the Fourth Amendment’s prohibition against warrantless *495 searches. In so holding, we reasoned that the exception for administrative searches was not applicable because the asserted administrative schemes "authorize[d] searches undertaken solely to uncover evidence of criminality [i.e., the possession of stolen property] and not to enforce a comprehensive regulatory scheme” (67 NY2d, at 344, supra).
On appeal, however, the United States Supreme Court reversed (482 US 691, supra). The Court disagreed with our primary premise that the administrative search exception cannot be used to validate warrantless searches conducted for the purpose of exposing violations of the State’s penal laws. Instead, the Court held, a State may "address a major social problem both by way of an administrative scheme and through penal sanctions” (id., at 712); consequently, the fact that section 415-a (5) (a)’s administrative objectives coincided with those of the Penal Law was of little significance. In support of its conclusion that section 415-a (5) (a) did not facially violate the Fourth Amendment, the Court stressed that the State had a substantial interest in regulating the vehicle dismantling industry as a means of deterring trafficking in stolen vehicles and that warrantless inspections were reasonably necessary to serve that interest. With regard to the requirement that the industry be a "closely regulated” one, the Court concluded that the requirement was satisfied because, although the vehicle dismantling business was a fairly recent phenomenon, it was "related to” the junkyard and pawnshop businesses, both of which, according to the Court, had been the subject of close State supervision in the past. Finally, the Court concluded that the functions that would otherwise be served by a warrant were satisfied because the statute placed adequate limitations on the time, place and scope of the administrative inspection (482 US, at 711-712, supra).
Ill
With that background in mind, we turn now to the question presented by this appeal: whether an inspection conducted pursuant to Vehicle and Traffic Law § 415-a (5) (a) violates the privacy rights encompassed within article I, § 12 of the New York State Constitution. We begin our analysis by noting that in determining the scope of the guarantees contained in our State Constitution, we — consistent with well-settled principles of federalism — are not bound by decisions of the Supreme *496 Court construing similar provisions of the Federal Constitution (People v Alvarez, 70 NY2d 375, 378; People ex rel. Arcara v Cloud Books, 68 NY2d 553, 557; People v Barber, 289 NY 378, 384). The dissent’s vigorously pressed argument to the contrary is amply answered in Judge Kaye’s concurring opinion. The soundness and thoroughness of that concurrence renders a further extended discussion of the dissent’s constitutional argument unnecessary.[3] Accordingly, rather than engaging in what would necessarily be a redundant exposition of basic analytical principles, we simply adopt the views expressed in the concurrence, including its well-founded point concerning the tone of the dissent, and add but a few brief comments on the issue.
The Supreme Court itself has on more than one occasion reminded us that we — as "the primary guardian[s] of the liberty of the people” (Massachusetts v Upton, 466 US 727, 739 [Stevens, J., dissenting]) — have the power to interpret the provisions of our State Constitution as providing greater protections than their Federal counterparts (see, e.g., California v Greenwood, 486 US 35, 43; Oregon v Hass, 420 US 714, 719). Indeed, this very Court recently had occasion to explain that: "Even if parallel to a Federal constitutional provision, a State constitutional provision’s presence in the document alone signifies its special meaning to the People of New York; thus, the failure to perform an independent analysis under the State Constitution would improperly relegate many of its provisions to redundancy” (People v Alvarez, 70 NY2d, at 379, n, supra, citing Kaye, Dual Constitutionalism in Practice and Principle, 42 Rec of Assn of Bar of City of NY 285, 297-299).
Although the language of the State and Federal constitutional proscriptions against unreasonable searches and seizures generally tends to support a policy of uniformity (see, People v Johnson, 66 NY2d 398, 406; People v Ponder, 54 NY2d 160, 165), we have not hesitated in the past to interpret *497 article I, § 12 of the State Constitution independently of its Federal counterpart when necessary to assure that our State’s citizens are adequately protected from unreasonable governmental intrusions (see, e.g., People v Scott, decided herewith; People v Dunn, 77 NY2d 19; People v Torres, 74 NY2d 224; People v P. J. Video, 68 NY2d 296; People v Class, 67 NY2d 431; People v Bigelow, 66 NY2d 417; People v Gokey, 60 NY2d 309). An independent construction of our own State Constitution is particularly appropriate where a sharp or sudden change in direction by the United States Supreme Court dramatically narrows fundamental constitutional rights that our citizens have long assumed to be part of their birthright (see, e.g., People v Griminger, 71 NY2d 635; People v Bigelow, supra; People v Johnson, supra).
Our firm and continuing commitment to protecting the privacy rights embodied within article I, § 12 of our State Constitution leads us to the conclusion that Vehicle and Traffic Law § 415-a (5) (a)’s provisions for warrantless, suspicionless searches of business premises cannot withstand challenge under our State Constitution (cf., Matter of Glenwood TV v Ratner, 65 NY2d 642, affg 103 AD2d 322, appeal dismissed 474 US 916).[4] While State and Federal uniformity is a worthwhile goal in constitutional decision-making, that goal "must yield * * * to [the need for] a predictable, structured analysis” (People v Johnson, 66 NY2d 398, 407, supra), lest the rules governing official intrusions on individuals’ privacy become muddied and the constitutional guarantees represented by article I, § 12 concomitantly diluted (see, People v P. J. Video, 68 NY2d, at 305, supra). Nowhere is that danger more evident than in this context, where the underlying issue involves the degree to which government inspectors may enter upon and search commercial establishments without either particularized suspicion (much less probable cause) or advance judicial oversight (see, People v Elwell, 50 NY2d 231 [expressing a preference for warrants issued by a neutral Magistrate]; People v Hanlon, 36 NY2d 549 [same]).
As Justice O’Connor has observed, statutes authorizing "administrative searches” are "the 20th-century equivalent” of colonial writs of assistance (Illinois v Krull, 480 US 340, *498 364 [O’Connor, J., dissenting]), which were general warrants authorizing officials to search any and all residential and commercial premises, without particularized suspicion, to enforce various trade regulations and restrictions and, more specifically, to halt the rampant smuggling of untaxed goods (see, Marshall v Barlow’s, Inc., 436 US, at 311, supra). Such writs were an important component of colonial resentment against the Crown and, in fact, "ignited the flame that led to American independence” (Comment, The Junking of the Fourth Amendment: Illinois v. Krull and New York v. Burger, 63 Tulane L Rev 335, 337; see, Davis v United States, 328 US 582, 603-606 [Frankfurter, J., dissenting]). Given this history and the potential similarity between writs of assistance and statutorily authorized administrative searches, the constitutional rules governing the latter must be narrowly and precisely tailored to prevent the subversion of the basic privacy values embodied in our Constitution. Because the principles and standards set forth in New York v Burger (supra) do not adequately serve those values, we decline to accept them as controlling in interpreting our own constitutional guarantees.
Thus, we adhere to the view expressed in People v Burger (67 NY2d, at 344, supra) that the so-called "administrative search” exception to the Fourth Amendment’s probable cause and warrant requirements cannot be invoked where, as here, the search is "undertaken solely to uncover evidence of criminality” and the underlying regulatory scheme is "in reality, designed simply to give the police an expedient means of enforcing penal sanctions.” This principle was a fundamental assumption in administrative-search jurisprudence before Burger (see, Donovan v Dewey, 452 US 594, 598, n 6, supra ["(warrant and probable-cause requirements) pertain when commercial property is searched for contraband or evidence of crime”]; Camara v Municipal Ct., 387 US 523, 539, supra [authorization of administrative searches on less than probable cause will not "endange[r] time-honored doctrines applicable to criminal investigations”]; Matter of Glenwood TV v Ratner, 103 AD2d, at 330, n 6, supra [noting that under approved regulatory scheme inspectors "do not seek evidence of a crime and their function is limited to insuring compliance with a civil regulatory scheme”]; see also, Michigan v Clifford, 464 US 287, 292; Michigan v Tyler, 436 US 499, 508; People v Calhoun, 49 NY2d 398, 405-406). And, notwithstanding Burger, it remains analytically sound, since, without such a limitation, what was originally conceived as a narrow excep *499 tion would swallow up the rule and permit circumvention of the traditional probable cause and warrant requirements where their protections are most needed.
Further, the administrative search provisions of Vehicle and Traffic Law § 415-a (5) (a) cannot pass constitutional muster because the essential element of pervasive governmental supervision is lacking. While the Supreme Court found this element to be satisfied by analogy to what it deemed "related” industries such as junkyards, which, according to that Court, are highly regulated, we conclude that more is required to permit an exception to the warrant and probable cause requirements embodied in article I, § 12. Once again, our insistence upon close analysis in this context is motivated by our belief that the administrative search exception should remain a narrow and carefully circumscribed one.
In order to fall within that exception, the regulatory scheme must be pervasive and include detailed standards in such matters as, for example, the operation of the business and the condition of the premises. While a precise and all-encompassing definition of what constitutes a "pervasive” regulatory scheme is not possible, such minimal regulatory requirements as the obligations to register with the government, to pay a fee and to maintain certain prescribed books and records are not, in themselves, sufficient. Indeed, in modern society, many trades and businesses are subject to licensing, bookkeeping and other similar regulatory measures. If the existence of such relatively nonintrusive obligations were sufficient, few businesses would escape being labeled "closely regulated,” and warrantless, suspicionless general inspections of commercial premises would become the rule rather than the exception (cf., Matter of Glenwood TV v Ratner, 103 AD2d, at 328-330, supra [upholding administrative inspection scheme that is limited to inspection of required records and business’s public areas]).
Vehicle and Traffic Law § 415-a (5) (a) is also constitutionally deficient in its failure to delineate rules to guarantee the "certainty and regularity of * * * application” necessary to provide a "constitutionally adequate substitute for a warrant” (Donovan v Dewey, supra, at 603). The statute does not set forth a minimum or maximum number of times that a particular establishment may be searched within a given time period, and it does not furnish guidelines for determining which establishments may be targeted. Further, because the regulatory scheme prescribes no standards or required prac *500 tices other than the maintenance of a "police book,” there are no real administrative violations that could be uncovered in a search and, concomitantly, there is nothing inherent in the statutory scheme to limit the scope of the searches it authorizes. Indeed, the only restriction that the statute contains is its requirement that the searches occur during business hours. This restriction is plainly insufficient to provide either a meaningful limitation on the otherwise unlimited discretion the statute affords or a satisfactory means to minimize the risk of arbitrary and/or abusive enforcement. As such, Vehicle and Traffic Law § 415-a (5) (a) shares one of the most objectionable characteristics of colonial writs of assistance.
Although the Supreme Court in Burger placed great weight on the fact that the statute is supported by a "substantial” governmental interest and that warrantless inspections are " 'necessary to further [the] regulatory scheme’ ” (482 US, at 708-710, quoting Donovan v Dewey, supra, at 600), we deem these factors in themselves to be insufficient justification for departing from article I, § 12’s general prohibition against warrantless, suspicionless searches. Such arguments are always available when the regulatory activity in question has a law enforcement-related goal. Obviously, the government’s interest in law enforcement is always, by definition, "substantial,” and tools such as unannounced general inspections, without judicial supervision or regulatory accountability, are always helpful in detecting and deterring crime. If these were the only criteria for determining when citizens’ privacy rights may be curtailed there would thus be few, if any, situations in which the protections of article I, § 12 would operate. Indeed, the very purpose of including such protections in our Constitution was to provide a counterbalancing check on what may be done to individual citizens in the name of governmental goals.
For the same reasons, the dissent’s reliance on the "staggering” statistics attesting to the growth of automobile theft in New York and the economic burdens such crime imposes are hardly a persuasive ground for relaxing article I, § 12’s proscription against unreasonable searches and seizures. The alarming increase of unlicensed weapons on our urban streets and the catastrophic rise in the use of crack cocaine and heroin are also matters of pressing social concern, but few would seriously argue that those unfortunate facets of modern life justify routine searches of pedestrians on the street or any other suspension of the privacy guarantees that are there to protect all of our citizens. The fact is that, regrettably, there *501 will always be serious crime in our society, and there will always be upsurges in the rate of particular crimes due to changes in the social landscape. Indeed, the writs of assistance were themselves a response of the colonial government to an unprecedented wave of criminal smuggling — a crime that also led to "intolerable” economic losses (see, dissenting opn, at 516-517).
Our responsibility in the judicial branch is not to respond to these temporary crises or to shape the law so as to advance the goals of law enforcement, but rather to stand as a fixed citadel for constitutional rights, safeguarding them against those who would dismantle our system of ordered liberty in favor of a system of well-kept order alone. As has recently been observed, the present crisis will, undoubtedly, abate, but the precedents we create now will long endure (Matter of Seelig v Koehler, 76 NY2d 87, 101 [Wachtler, Ch. J., dissenting]). Accordingly, in response to the dissent’s appeal to our citizens’ legitimate fears about rising crime, it suffices to observe, as Benjamin Franklin did some 200 years ago, that "those who give up essential liberty to purchase a little temporary safety deserve neither liberty nor safety.”
We therefore conclude that, in the final analysis, our constitutional privacy guarantee generally requires probable cause and warrants, with their attendant case-by-case judicial oversight, as a condition to official entries on, and searches of, private premises. While we have from time to time been willing to recognize exceptions to these requirements in certain narrowly circumscribed situations, we have never suggested the existence of a generalized, wholesale exception to the warrant and probable cause requirements that may be invoked whenever necessary to enhance the effectiveness of the State’s law enforcement efforts. Rather, we have always insisted that there be some additional particularized factor, such as the exigencies of "hot pursuit” or the existence of a business that is truly "closely regulated,” in order to justify dispensing with one or both of those constitutional prerequisites. Since none of those special factors is present here, the search of defendant’s premises was constitutionally impermissible.
We do not, of course, mean to suggest that the Legislature could never, consistent with article I, § 12, provide for administrative inspections of vehicle dismantling businesses. Unlike the statute before us, however, the inspection provisions must be part of a comprehensive administrative program *502 that is unrelated to the enforcement of the criminal laws. Moreover, the inspections must be pursuant to an administrative warrant issued by a neutral Magistrate, although they need not be based on probable cause in the traditional sense (see, Camara v Municipal Ct., supra, at 538-539; Marshall v Barlow’s, Inc., supra, at 320-321), or, alternatively, the law must provide for such certainty and regularity of application as to be a constitutionally adequate substitute for a warrant (see, Donovan v Dewey, 452 US 594, 603, supra).[5] In this case, however, those standards were not satisfied.[6]
Accordingly, the order of the Appellate Division should be reversed, the order of the Supreme Court granting defendant’s motion to suppress reinstated and the case remitted to the Appellate Division for consideration of the facts (CPL 470.25 [2] [d]; 470.40 [2] [b]).

. See generally, Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv L Rev 489; Galie, Modes of Constitutional Interpretation: The New York Court of Appeals Search for a Role, 4 Emerging Issues in St Const Law 225; Galie, State Constitutional Guarantees and Protection of Defendants’ Rights: The Case of New York, 1960-1978, 28 Buffalo L Rev 157.

. Calling attention to the Court’s reference to the nature of defendants’ illegal activities — activities discovered only as a result of illegal entry by the police — Justice Marshall, in his dissent, observed that the inquiry as to whether the expectation of privacy is reasonable in most circumstances *484 "requires analysis of the sorts of uses to which a given space is susceptible, not the manner in which the person asserting an expectation of privacy in the space was in fact employing it. See, e. g., United States v. Chadwick, 433 U. S., at 13. We make exceptions to this principle and evaluate uses on a case-by-case basis in only two contexts: when called upon to assess (what formerly was called) the 'standing’ of a particular person to challenge an intrusion by government officials into a area over which that person lacked primary control, see, e. g., Rakas v. Illinois, 439 U. S., at 148-149; Jones v. United States, 362 U. S. 257, 265-266 (1960), atid when it is possible to ascertain how a person is using a particular space without violating the very privacy interest he is asserting, see, e. g., Katz v. United States, 389 U. S., at 352. * * * Neither of these exceptions is applicable here. Thus, the majority’s contention that, because the cultivation of marihuana is not an activity that society wishes to protect, Oliver and Thornton had no legitimate privacy interest in their fields, ante, at 182-183, and n. 13, reflects a misunderstanding of the level of generality on which the constitutional analysis must proceed.” (Oliver v United States, id., at 191-192, n 13 [emphasis added].)

. As Justice Marshall observed: "Privately owned woods and fields that are not exposed to public view regularly are employed in a variety of ways that society acknowledges deserve privacy. Many landowners like to take solitary walks on their property, confident that they will not be confronted in their rambles by strangers or policemen. Others conduct agricultural businesses on their property. Some landowners use their secluded spaces to meet lovers, others to gather together with fellow worshippers, still others to engage in sustained creative endeavor. Private land is sometimes used as a refuge for wildlife, where flora and fauna are protected from human intervention of any kind” (id., at 192 [Marshall, J., dissenting]).

. In Chadwick the Court held that the rationale of the "automobile exception” did not provide a basis for the warrantless inspection of a closed container in the trunk of an automobile and that a defendant has a greater expectation of privacy in personal luggage than in an automobile. This holding was abandoned and Chadwick together with Arkansas v Sanders (442 US 753) was overruled on May 30, 1991 in California v Acevedo (500 US —, 111 S Ct 1982-1991; see, Green, "Power, Not Reason”: Justice Marshall’s Valedictory and the Fourth Amendment in the Supreme Court’s 1990 Term, 70 NC L Rev 373, 374, n 5, 387-396).

. To these reasons may be added the Oliver majority’s suggestion that, in deciding whether a landowner’s expectation of privacy is legitimate, a court may consider the legality of the very conduct sought to be kept private (see, supra, at 483-484, n 2, quoting Oliver [Marshall, J., dissenting]). It is obvious that such a rule, if allowed, would contravene our established search and seizure law and offend accepted notions as to the proper limits on governmental authority to intrude upon and control noninjurious activities of its citizens conducted within the private confines of their property.

. Vehicle and Traffic Law § 415-a (5) (a) provides, in part: "Every person required to be registered pursuant to this section shall maintain a record of all motor vehicles, trailers, and major component parts thereof, coming into his possession together with a record of the disposition of any such motor vehicle, trailer or part thereof and shall maintain proof of ownership for any motor vehicle, trailer or major component part thereof while in his possession. Such records shall be maintained in a manner and form prescribed by the commissioner. * * * Upon request of an agent of the commissioner or of any police officer and during his regular and usual business hours, a vehicle dismantler shall produce such records and permit said agent or police officer to examine them and any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises. * * * The failure to produce such records or to permit such inspection on the part of any person required to be registered pursuant to this section as required by this paragraph shall be a class A misdemeanor.”

. New York City Charter § 436 provides: "The commissioner [of the police department] shall possess powers of general supervision and inspection over all licensed or unlicensed pawnbrokers, vendors, junkshop keepers, junk boatmen, cartmen, dealers in second-hand merchandise and auctioneers within the city; and in connection with the performance of any police duties he shall have power to examine such persons, their clerks and employees and their books, business premises, and any articles of merchandise in their possession. A refusal or neglect to comply in any respect with the provisions of this section on the part of any pawnbroker, vendor, junkshop keeper, junk boatman, cartman, dealer in second-hand merchandise or auctioneer, or any clerk or employee of any thereof shall be triable by a judge of the criminal court and punishable by not more than thirty days’ imprisonment, or by a fine of not more than fifty dollars, or both.”

. Apart from its basic philosophical difference with us as to analytical methodology, the only substantive objection the dissent seems to have is that the Court, in both this case and People v Scott (decided herewith), has carved a new "generalized” right of privacy out of a constitutional provision that protects only against invasions of privacy that implicate the constitutional proscription against "unreasonable searches and seizures” (NY Const, art I, § 12). Although that point is stated throughout the dissenters’ opinion, nowhere does the dissent explain how the State constitutional privacy right we recognize here differs from "the traditional expectation of privacy attribute of the unreasonable searches and seizures protection [previously recognized] in criminal jurisprudence” (dissenting opn, at 513).

. Contrary to the dissent’s intimation (at 517), there is no inconsistency between our holding here and the Court’s earlier decision in Glenwood TV. To the contrary, the constitutional analysis in that case, which this Court expressly adopted (65 NY2d, at 644), tracks the analysis we utilize here and therefore lends affirmative support to the approach we have now taken.

. Should a regulatory scheme be created consistent with these constitutionally required principles, the prosecution of criminal violations uncovered as an incident to its execution would not offend the Constitution.

. We hasten to refute the dissent’s suggestion that "random inspections” undertaken pursuant to the challenged statutes would not be constitutionally objectionable if carried out by administrative agents of the Department of Motor Vehicles rather than police officers (dissenting opn, at 515). The dissent posits this distinction in order to argue that our rule leads to "artificial distinctions” and is therefore "unsound.” However, the distinction the dissent sets up as a "straw man” is, in fact, nonexistent. Regardless of whether the "inspection” is undertaken by a police officer or an administrative officer, the State Constitution is offended if the standards we have described above are unsatisfied.