OPINION OF THE COURT
Victor B. Chambers, J.
The defendant has been charged with speeding 38 in a 30 mile-per-hour speed zone in violation of section 1180 (d) of the Vehicle and Traffic Law and failure to exercise due care in violation of Vehicle and Traffic Law § 1146 as the result of a fatal automobile pedestrian accident occurring on October 18, 2003.
Upon initial investigation by the Newark Police Department, it was determined to seek the assistance of New York State Trooper Robert J. Frost, who has been assigned to conduct accident reconstruction for the New York State Police. Upon arrival at the scene Trooper Frost, conducted an examination of defendant’s vehicle, which was parked at the side of the road, unlocked. At that time, the pedestrian, Mabel Hommer, had died. Aside from the investigation we would expect of an *311 automobile fatality, including measurement of skid marks, extensive photographing of the scene, determination of the relative position of the vehicle fragments and personal property, and determination of the point of impact, Trooper Frost used computer equipment in his police car to download information from the sensing diagnostic module (SDM) located in the defendant’s vehicle. He conducted this procedure without seeking or obtaining the permission of the defendant. To do so, Trooper Frost asserted control over the vehicle, directing it not be moved until his investigation was completed. After accomplishing the tests the vehicle was returned to the defendant. Trooper Frost thus “impounded” the vehicle even if for a short period of time. His tests also included operating the vehicle to confirm that the brakes were working properly, and use of a “total station” measuring device to chart the relative position of landmarks, intersections, the location of the automobile, debris and personal property. Trooper Frost also operated the vehicle with an accelerometer attached in order to measure the braking capability of the car.
The sensing diagnostic module has been installed in General Motors vehicles since 1990. The system detects acceleration or deceleration and makes decisions every 10 milliseconds whether or not to deploy the passive restraint system in the vehicle. The system also stores vehicle data such as vehicle speed, engine RPM, throttle percentage and brake data, change in velocity or delta V and seat belt usage, all in one second increments for a period of five seconds. After a deployment or near deployment of the air bags the data is stored for a further period of time.
Vetronix Corporation has produced a crash data retrieval system which allows for the downloading of the above information into a laptop computer, which will then generate reports for the use of accident reconstruction. It is this system that Trooper Frost used to supplement his investigation of defendant’s accident. Physically, this was accomplished by connecting a wire to a plug located under the dashboard of defendant’s vehicle, which allowed the download.
The uncontradicted evidence is that the connection to the computer is one way; that is, the data in defendant’s SDM cannot be corrupted or modified by connection to the computer in the police car. It is further uncontradicted that the data in the SDM after a deployment or near deployment can or will be erased after the car ignition is turned on 250 times or if another deployment or near deployment event occurs. The events that *312 could trigger the loss of this information include bumping the vehicle into a curb, hitting a pothole, or suddenly engaging the brakes causing a faster deceleration than that which occurred during the accident. Such loss of data could occur only if the ignition of the car was turned on.
Trooper Frost testified at the trial that he was able to reconstruct the speed of the defendant’s vehicle using three methods. He first used the data from the SDM in defendant’s vehicle to determine that the speed during the last five seconds before impact was 37, 37, 38, 38 and 38, respectively. Secondly, he testified about a measured “head strike,” or the location on defendant’s windshield where the pedestrian’s head came in contact. From these measurements he determined the speed of defendant’s vehicle to be between 30 and 45 miles per hour. Third, he used the measurement of the tire marks, together with the data from the accelerometer to determine the deceleration rate and applied mathematical formulation to determine a speed of 38 miles per hour at impact.
Under cross-examination Trooper Frost stated that the mere fact that data downloaded from the SDM is not a determination that the data is correct. He also stated that he does not base an opinion on automobile speed using the SDM data alone. There was no testimony that the module in defendant’s vehicle could be calibrated in any way, as one might do with a radar instrument or a breathalyzer.
Defendant produced a witness who testified that he was following defendant’s vehicle immediately before the accident, that he never saw the pedestrian until she was hit by defendant’s car, and that he estimated his own speed at approximately 30 miles per hour. He was not, however, able to form an estimate of the speed of defendant’s vehicle.
Issues
1. Was the retrieval of the data stored in defendant’s sensing diagnostic module conducted in violation of defendant’s rights under the Fourth and Fourteenth Amendments of the United States Constitution or article I, § 12 of the New York State Constitution?
2. Does section 603 and/or section 603-a of the Vehicle and Traffic Law require and allow an investigating police officer to conduct an investigation of a vehicle involved in an accident in which a death or serious physical injury occurs, including the data stored in the vehicle’s sensing diagnostic module?
*313 3. What type of evidence foundation must be laid to allow the admission into evidence of the downloaded results from the sensing diagnostic module in the defendant’s automobile?
4. Is proof of the results of the download of the SDM together with the testimony of the accident reconstructionist as to the calculation of speed by measurement of skid marks and deceleration data, together with measurements of a “head strike” sufficient to sustain a finding of guilt of speeding beyond a reasonable doubt?
5. Was the proof adduced sufficient to prove a violation of Vehicle and Traffic Law § 1146 beyond a reasonable doubt?
Discussion of Issues One and Two
Section 603 (1) of the Vehicle and Traffic Law, first enacted in 1993, provides in pertinent part “Every police . . . officer to whom an accident resulting in injury to a person shall have been reported . . . shall immediately investigate the facts . . . and report the matter to the commissioner [of Motor Vehicles].” This statute, and its constitutional implications were thoroughly discussed in People v Quackenbush (88 NY2d 534 [1996]). The application of this case to the instant matter will be discussed below.
In 2001 section 603-a of the Vehicle and Traffic Law was enacted which provides that any motor vehicle accident reported or discovered by a police officer and which accident results in the serious physical injury or death shall be investigated by the officer. The statute further provides that “[s]uch investigation shall be conducted for the purposes of making a determination of the following: the facts and circumstances of the accident; . . . the contributing factor or factors; whether it can be determined if a violation or violations of this chapter occurred; . . . and, the cause of such accident.” (Vehicle and Traffic Law § 603-a [1].) This statute substantially increases and specifies the responsibility of a police officer conducting the investigation from that originally mandated in Vehicle and Traffic Law § 603.
In the case of People v Quackenbush (supra), the defendant was involved in a fatal pedestrian accident involving a bicyclist. The police impounded his car, and, two days later, conducted a safety inspection of the equipment of the vehicle, including brakes. The brakes were found to be deficient and defendant was charged with the misdemeanor of operating with defective brakes in violation of Vehicle and Traffic Law § 375 (1).
The defendant moved to suppress the results of the inspection upon the same grounds as urged here. The Court of Ap *314 peals concluded that (at 537) “the police possessed the authority to impound the vehicle in order to comply with the investigatory and reporting duties imposed by Vehicle and Traffic Law § 603.” The Court stated (at 537) that because a vehicle’s safety equipment was subject to “extensive government regulations,” including mandatory annual inspection, that a safety inspection after a fatal accident “did not offend the constitutional prohibitions against unreasonable searches and seizures.”
Having once determined that the impoundment procedure was satisfactory the Court then considered the process of the subsequent search. There was no exigency to the search involving mobility of the vehicle as it was under their control. Holding that only unreasonable searches violative of expectations of privacy were proscribed and finding that the search there was justified at the inception and limited in scope (citing Terry v Ohio, 392 US 1 [1968]), the Court upheld the search and denied the motion to suppress. The Court found only a diminished expectation of privacy in the mechanical areas of the vehicle and further found that that expectation must yield to the overwhelming state interest in investigating fatal accidents. (People v Quackenbush, supra at 539.) The Court also found that the search conducted of the safety equipment of the truck in question was of an administrative nature, rather than an attempt to gather information to form the basis of a criminal prosecution. (See People v Scott, 79 NY2d 474 [1992].) In the area of automobile safety, there is a high degree of governmental regulation, and a search conducted to carry out this regulation has a lower threshold of reasonableness. Since the testing done of the SDM records data regarding the performance of the vehicle during the incident such testing is a reasonable extension of Quackenbush. The downloading of the information is not analogous to a container search, nor does it extend to the private areas of the vehicle. There is also no opportunity for a police officer to select only the desired data or to manipulate it.
The United States Supreme Court has held that in the interest of public safety automobiles are frequently taken into custody. Vehicle accidents present one such occasion. (South Dakota v Opperman, 428 US 364 [1976].)
In the case at bar the intrusion sought to be prohibited is significantly less. In Quackenbush, the whole vehicle was seized, taken from the scene, held for over two days and partially taken apart. Here, the vehicle wasn’t moved, only one door was *315 opened, a sampling taken and the car immediately returned to the defendant.
We now turn to the concept of exigency. While a pure “automobile exception” does not apply since the officer had no probable cause to believe that evidence of a crime was contained within the car, courts have upheld warrantless searches of automobiles based upon exigency. (Carroll v United States, 267 US 132 [1925].) Such an exception now has been mostly replaced by findings that automobiles contain a diminished expectation of privacy. (Cardwell v Lewis, 417 US 583 [1974]; Robbins v California, 453 US 420 [1981].) Here, however, real exigency exists. Evidence regarding the preaccident conditions within defendant’s automobile could easily be destroyed, either purposely or accidently, if the automobile was moved from the scene under its own power.
While Quackenbush would appear to allow impoundment of the vehicle and subsequent inspection pursuant to the authority of Vehicle and Traffic Law § 603 (now enhanced by Vehicle and Traffic Law § 603-a), I conclude that the immediate download of information from the defendant’s SDM is permitted and required by Vehicle and Traffic Law § 603-a and is not violative of defendant’s rights to be free from unreasonable searches pursuant to the United States or New York Constitution.
Discussion of Issue Three
Since People v Magri (3 NY2d 562 [1958]), New York has allowed the introduction of evidence of proven, reliable scientific principles such as radar, photography, X rays, clocks and ballistics, among others. When the data obtained from such systems is deemed reliable, such evidence is admissible without the need to lay a foundation by the introduction of expert testimony describing and endorsing the science involved. Thus, the reading of a speedometer would be admissible, without more, as a recording devise.
The admissibility of evidence of the data recorded on a SDM has been received into evidence as “generally accepted as reliable and accurate by the automobile industry and the [National Highway and Traffic Safety Administration].” See Bachman v General Motors Corp. (332 III App 3d 760, 768, 766 NE2d 262, 272 [4th Dist 2002]), which held that such evidence was admissible under the standards of Frye v United States (293 F 1013 [1923]).
*316 The court thus concludes that such evidence is admissible in this case.
Discussion of Issue Four
The People rely upon three elements of proof to establish defendant’s guilt of speeding in violation of Vehicle and Traffic Law § 1180 (d). The unquestioned testimony is that the accident took place within a 30-mile-per-hour speed zone in the Village of Newark. The first element is the data retrieved by the crash data retrieval system, previously ruled to be admissible, which reflected a speed within the five second period before impact at 37 to 38 miles per hour. Next was proof of the measurement of skid marks, location of the pedestrian after the accident, a calculation of the point of impact and measurement of the vehicle’s braking capability. The results of these measurements were “plugged into” formulas learned by the officer during his training, all of which provided a speed of 38 miles per hour at impact. The windshield of defendant’s car showed a spidernet cracking just above the dashboard on the left side. The officer testified that he could calculate a range of speed based on the location of this “head strike” and that the measurements in this case reflected a speed at impact of 30 to 45 miles per hour.
In any number of cases speed has been adjudicated by measurement of physical evidence at the scene of an accident. In Matter of Farrell v Adduci (138 AD2d 944 [1988]), there was testimony of measurement of skid marks in determining speed. There is no need even for a measuring device. See People v Olsen (22 NY2d 230 [1968]), where a conviction of speeding was upheld, the evidence of which consisted of the mére testimony of officers as to their estimate of speed. (See also People v Correia, 140 Misc 2d 813 [1988].) The court concludes that the evidence submitted at trial was sufficient to prove defendant’s guilt of speeding beyond a reasonable doubt.
Discussion of Issue Five
The vast majority of reported cases interpreting section 1146 of the Vehicle and Traffic Law are civil rather than criminal, or are cases reviewing a determination by the Department of Motor Vehicles. The section requires that drivers exercise that degree of care to avoid striking a pedestrian as a reasonable driver would exercise in like circumstances. The evidence, in the form of statements of the defendant and the testimony of *317 one eyewitness is not of sufficient degree to establish, in this court’s opinion, that defendant is guilty of a violation of this section beyond a reasonable doubt.
In defendant’s statement to police he reported that he was proceeding south in his own lane, on South Main Street, which at that point is a wide, two-lane road. Defendant stated that he saw the pedestrian on the west side of the roadway, standing several feet onto the pavement, but not in that portion of road being traveled by vehicles. She was facing east. She was not in a cross walk. As defendant continued south he observed a person emerge from a business located on the east side of the street, and in order to do that he glanced to the left. As he looked back to the street he felt the impact of striking the pedestrian.
A witness testified that he was following the defendant, approximately 40 feet behind. He never saw the pedestrian until she was struck by the car ahead of him.
In driving down a road, it is reasonable to assume that a pedestrian, standing out of the traveled lane of the road, will remain there while traffic passes. To require a driver approaching such a pedestrian to obtain “eye contact” is not reasonable. Nor is the fact that defendant was proceeding at a speed of 38 miles per hour sufficient to establish a violation of this section.