97 N.Y.2d 341 (2001)
767 N.E.2d 638
741 N.Y.S.2d 147
THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v.
FRANK ROBINSON, Appellant.
THE PEOPLE OF THE STATE OF NEW YORK, Appellant,
v.
PATRICK J. REYNOLDS, Respondent.
THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v.
JERRY GLENN, Also Known as JEFFREY WILLIAMSON, Appellant.
Court of Appeals of the State of New York.
Argued October 10, 2001.
Decided December 18, 2001.
*343 Abigail Everett, New York City, and Robert S. Dean for appellant in the first above-entitled action.
Robert T. Johnson, District Attorney of Bronx County, Bronx (Cheryl D. Harris, Joseph N. Ferdenzi and Stuart P. Levy of counsel), for respondent in the first above-entitled action.
John C. Tunney, District Attorney of Steuben County, Mark Dwyer, New York City, and Susan Gliner for New York State District Attorneys Association, amicus curiae in the first above-entitled action.
*344 Howard R. Relin, District Attorney of Monroe County, Rochester (Stephen K. Lindley of counsel), for appellant in the second above-entitled action.
Thomas A. Corletta, Rochester, for respondent in the second above-entitled action.
*345 Andrew C. Fine, New York City, and Heidi Bota for appellant in the third above-entitled action.
Robert M. Morgenthau, District Attorney of New York County, New York City (Eleanor J. Ostrow and Hilary Hassler of counsel), for respondent in the third above-entitled action.
Brennan Center for Justice at NYU School of Law, New York City (Roslyn Powell, Kirsten D. Levingston and E. Joshua Rosenkranz of counsel), for 100 Blacks in Law Enforcement Who Care, amicus curiae in the third above-entitled action.
Harrington & Mahoney, Buffalo (Mark J. Mahoney of *346 counsel), for New York State Defenders Association, amicus curiae in the first, second and third above-entitled actions.
Judges WESLEY, ROSENBLATT and GRAFFEO concur with Judge SMITH; Judge LEVINE dissents and votes to reverse and remit to Supreme Court in a separate opinion in which Chief Judge KAYE and Judge CIPARICK concur.

OPINION OF THE COURT
SMITH, J.
The issue here is whether a police officer who has probable cause to believe a driver has committed a traffic infraction violates article I, § 12 of the New York State Constitution when the officer, whose primary motivation is to conduct another investigation, stops the vehicle. We conclude that there is no violation, and we adopt Whren v United States (517 US 806) as a matter of state law.

I

People v Robinson
On November 22, 1993, New York City police officers in the Street Crime Unit, Mobile Taxi Homicide Task Force were on night patrol in a marked police car in the Bronx. Their main assignment was to follow taxicabs to make sure that no robberies occurred. After observing a car speed through a red light, the police activated their high intensity lights and pulled over what they suspected was a livery cab. After stopping the cab, one officer observed a passenger, the defendant, look back several times. The officers testified that they had no intention of giving the driver a summons but wanted to talk to him about *347 safety tips. The officers approached the vehicle with their flashlights turned on and their guns holstered. One of the officers shined his flashlight into the back of the vehicle, where defendant was seated, and noticed that defendant was wearing a bulletproof vest. After the officer ordered defendant out of the taxicab, he observed a gun on the floor where defendant had been seated. Defendant was arrested and charged with criminal possession of a weapon and unlawfully wearing a bulletproof vest. Defendant moved to suppress the vest and gun, arguing that the officers used a traffic infraction as a pretext to search the occupant of the taxicab. The court denied the motion, and defendant was convicted of both charges. He was sentenced as a persistent violent felony offender to eight years to life on the weapons charge and 1½ to 3 years on the other charge.
In affirming, the Appellate Division applied the Whren rationale (271 AD2d 17 [2000]). We affirm the unanimous order of the Appellate Division.

People v Reynolds
On March 6, 1999, shortly after midnight, a police officer, on routine motor patrol in the City of Rochester, saw a man he knew to be a prostitute enter defendant's truck. The officer followed the truck and ran a computer check on the license plate. Upon learning that the vehicle's registration had expired two months earlier, the officer stopped the vehicle.
The resulting investigation did not lead to any charges involving prostitution. Nevertheless, because the driver's eyes were bloodshot, his speech slurred and there was a strong odor of alcohol, police performed various field sobriety tests, with defendant failing most. Defendant was placed under arrest for driving while intoxicated. At the police station, tests indicated that defendant's blood alcohol level was .20%, double the legal limit of .10% (see, Vehicle and Traffic Law § 1192 [2]).
Defendant was charged with driving while intoxicated, an unclassified misdemeanor, and operating an unregistered motor vehicle, a traffic infraction. Defendant's motion to suppress was granted by the Rochester City Court which dismissed all charges. County Court affirmed the dismissal, holding that the traffic violation was merely a pretext and the officer's primary motivation was to investigate prostitution. We reverse.

People v Glenn
On November 7, 1997, plainclothes police officers were on street crime patrol in an unmarked car in Manhattan. They *348 observed a livery cab make a right hand turn without signaling. An officer noticed someone sitting in the back seat lean forward. The police stopped the vehicle to investigate whether or not a robbery was in progress. A police officer subsequently found cocaine on the rear seat and, after he arrested defendant, found additional drugs on his person. Defendant was charged with criminal possession of a controlled substance in the third degree and criminally using drug paraphernalia in the second degree. He contended that the drugs should be suppressed, asserting that the traffic infraction was a pretext to investigate a robbery. After his motion to suppress was denied, he pleaded guilty to one count of criminal possession of a controlled substance and was sentenced, as a second felony offender, to 4½ to 9 years in prison. Relying on Whren, the Appellate Division unanimously affirmed the conviction (279 AD2d 422 [2001]). We affirm the order of the Appellate Division.

II
The Supreme Court, in Whren v United States (517 US 806 [1996]), unanimously held that where a police officer has probable cause to detain a person temporarily for a traffic violation, that seizure does not violate the Fourth Amendment to the United States Constitution even though the underlying reason for the stop might have been to investigate some other matter.
In Whren, officers patrolling a known drug area of the District of Columbia became suspicious when several young persons seated in a truck with temporary license plates remained at a stop sign for an unusual period of time, and the driver was looking down into the lap of the passenger seated on his right. After the car made a right turn without signaling, the police stopped it, assertedly to warn the driver of traffic violations, and saw two plastic bags of what appeared to be crack cocaine in Whren's hands.
After arresting the occupants, the police found several quantities of drugs in the car. The petitioners were charged with violating federal drug laws. The petitioners moved to suppress the drugs, arguing that the stop was not based upon probable cause or even reasonable suspicion that they were engaged in illegal drug activity and that the police officer's assertion that he approached the car in order to give a warning was pretextual. The District Court denied suppression, and the Court of Appeals for the District of Columbia Circuit affirmed (53 F3d 371 [1995]).
The Supreme Court held that the Fourth Amendment had not been violated because "[a]s a general matter, the decision *349 to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred" (Whren, supra, 517 US, at 810). The stop of the truck was based upon probable cause that the petitioners had violated provisions of the District of Columbia traffic code. The Court rejected any effort to tie the legality of the officers' conduct to their primary motivation or purpose in making the stop, deeming irrelevant whether a reasonable traffic police officer would have made the stop. According to the Court, "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis" (id., at 813). Thus, the "Fourth Amendment's concern with `reasonableness' allows certain actions to be taken in certain circumstances, whatever the subjective intent" (id., at 814).
More than 40 states and the District of Columbia have adopted the objective standard approved by Whren or cited it with approval (see, Appendix).[1]

III
In each of the cases before us, defendant argues that the stop was pretextual and in violation of New York State Constitution, article I, § 12. By arguing that the stops were pretextual, defendants claim that although probable cause existed warranting a stop of the vehicle for a valid traffic infraction, the officer's primary motivation was to conduct some other investigation.
We hold that where a police officer has probable cause to believe that the driver of an automobile has committed a traffic violation, a stop does not violate article I, § 12 of the New York State Constitution. In making that determination of probable cause, neither the primary motivation of the officer nor a determination of what a reasonable traffic officer would have done under the circumstances is relevant.
*350 We have observed that because the search and seizure language of the Fourth Amendment and of article I, § 12 is identical, they generally confer similar rights (see, People v Harris, 77 NY2d 434, 437 [1991]; People v P. J. Video, 68 NY2d 296, 304 [1986]).[2] Nevertheless, this Court has not hesitated to expand the rights of New York citizens beyond those required by the Federal Constitution when a longstanding New York interest was involved (see, e.g., People v Scott, 79 NY2d 474 [1992]; People v Keta, 79 NY2d 474 [1992]; People v Griminger, 71 NY2d 635 [1988]; People v P. J. Video, supra; People v Bigelow, 66 NY2d 417 [1985]).
This Court has always evaluated the validity of a traffic stop based on probable cause that a driver has committed a traffic violation, without regard to the primary motivation of the police officer or an assessment that a reasonable traffic officer would have made the same stop. Where the police have stopped a vehicle for a valid reason, we have upheld police conduct without regard to the reason for the stop (People v David L., 81 AD2d 893, revd on dissent below 56 NY2d 698 [1982], cert denied 459 US 866).
This Court has never held that a pretextual stop, as opposed to subsequent police conduct, was violative of article I, § 12. The dissent does not disagree (dissenting opn at 367-368). Although the Appellate Divisions have, on occasion, examined the primary motivation of a police officer in evaluating a traffic stop, all seven of the Judges on this Court acknowledge the "difficulty, if not futility, of basing the constitutional validity of searches or seizures on judicial determinations of the subjective motivation of police officers" (dissenting opn at 371). Thus, we are unanimous in our view that the primary motivation test is not, and should not be, part of our State constitutional jurisprudence.
*351 Defendants, however, point to several of our casesmost notably People v Spencer (84 NY2d 749 [1995])and contend that we have previously indicated our disapproval of pretextual police conduct. Defendants' reliance on People v Spencer is misplaced. There, we held that the stop of the vehicle merely to request information from the driver concerning the whereabouts of a criminal suspect was an unreasonable seizure in violation of the Fourth Amendment. In that case, the defendant had not committed a traffic violation.
We noted that "police stops of automobiles in this State are legal only pursuant to routine, nonpretextual traffic checks to enforce traffic regulations or when there exists at least a reasonable suspicion that the driver or occupants of the vehicle have committed, are committing, or are about to commit a crime" (id., at 753). However, we explained what we meant by pretextual when we further noted that "there were no objective safeguards circumscribing the exercise of police discretion" and that if such stops "were permissible and motorists could in fact be pulled over at an individual police officer's discretion based upon the mere right to request information, a pandora's box of pretextual police stops would be opened" (id., at 758, 759). Central to Spencer's holding was the absence of an objective standard for stopping a vehicle. Thus, a police officer could contrive a reason to stop a vehicle merely to make an inquiry. However, an objective standard is present herethe Vehicle and Traffic Law.
Moreover, in none of the cases in which we have extended the rights of New York State defendants beyond those of the Federal Constitution have we questioned a police officer's authority to act when there was probable cause to conclude that a law or regulation has been violated. None of the reasons for extending protections of our Constitution beyond those given by the Federal Constitution exist here. In this case, regulating the ability of the police to stop a vehicle when there is probable cause to believe that a traffic regulation has been violated does little to expand the rights of the accused. Instead it may lead to the harm of innocent citizens. Thus, for example, in People v Reynolds, the stop of the automobile led to the arrest of a person driving under the influence of alcohol.
The real concern of those opposing pretextual stops is that police officers will use their authority to stop persons on a selective and arbitrary basis. Whren recognized that the answer to such action is the Equal Protection Clause of the Constitution. We are not unmindful of studies, some of which *352 are cited by defendants and the amici,[3] which show that certain racial and ethnic groups are disproportionately stopped by police officers, and that those stops do not end in the discovery of a higher proportion of contraband than in the cars of other groups. The fact that such disparities exist is cause for both vigilance and concern about the protections given by the New York State Constitution. Discriminatory law enforcement has no place in our law.
Indeed, in Brown v State of New York (89 NY2d 172 [1996]), this Court recognized that in New York State, a plaintiff has a cause of action for a violation of the Equal Protection Clause[4] and the Search and Seizure Clause of the State Constitution. In upholding the right of African Americans to sue for alleged violations of their right to equal protection and freedom from unreasonable searches and seizures, when they were detained because of their race during a police investigation, this Court stated:
"These sections [art I, §§ 11, 12] establish a duty sufficient to support causes of action to secure the liberty interests guaranteed to individuals by the State Constitution independent of any common-law tort rule. Claimants alleged that the defendant's officers and employees deprived them of the right to be free from unlawful police conduct violating the Search and Seizure Clause and that they were treated discriminatorily in violation of the State Equal Protection Clause. The harm they assert was visited on them was well within the contemplation of the framers when these provisions were enacted for fewer matters have caused greater concern throughout history than intrusions on personal liberty *353 arising from the abuse of police power. Manifestly, these sections were designed to prevent such abuses and protect those in claimants' position. A damage remedy in favor of those harmed by police abuses is appropriate and in furtherance of the purpose underlying the sections" (89 NY2d, at 191).
The alternatives to upholding a stop based solely upon reasonable cause to believe a traffic infraction has been committed put unacceptable restraints on law enforcement. This is so whether those restrictions are based upon the primary motivation of an officer or upon what a reasonable traffic police officer would have done under the circumstances. Rather than restrain the police in these instances, the police should be permitted to do what they are sworn to douphold the law.
In none of the cases cited by defendants has this Court penalized the police for enforcing the law. We should not do so here. To be sure, the story does not end when the police stop a vehicle for a traffic infraction. Our holding in this case addresses only the initial police action upon which the vehicular stop was predicated. The scope, duration and intensity of the seizure, as well as any search made by the police subsequent to that stop, remain subject to the strictures of article I, § 12, and judicial review (People v Troiano, 35 NY2d 476 [1974]; People v Marsh, 20 NY2d 98 [1967]).

IV
We turn now to the dissent. Our dissenting colleagues correctly recognize that any exercise of police power under the Fourth Amendment of the United States Constitution and our State constitutional corollary must be reasonablea seizure by the police may not be arbitrary. The dissent, however, treats arbitrariness in the context of a traffic stop as an added inquiry separate and distinct from probable cause. There is no valid basis for us to bifurcate these concepts.
Probable cause to believe that an individual has violated a law, or regulation having the force of law, has been equated with the sum of the requirements of the State and Federal Constitutions in this area. Only in the absence of established probable cause have the United States Supreme Court and this Court examined the arbitrariness of police conduct so as to require that police activities be governed by objective standards that restrict officers in looking for incriminating evidence (see, e.g., Florida v Wells, 495 US 1 [1990]; People v Galak, 80 NY2d 715 [1993]). A police officer who can articulate *354 credible facts establishing reasonable cause to believe that someone has violated a law has established a reasonable basis to effectuate a stop. This is in contrast to an inventory search where arbitrariness is necessarily part of the reasonableness equation. In inventory cases, an officer who has impounded a vehicle following a valid arrest can inventory the contents only pursuant to established guidelines to identify and protect the owner's property. The officer cannot on mere whim look for incriminating evidence. When dealing with inventory searches because probable cause for an evidence search is lackingthe courts undertake a separate analysis as to arbitrariness. Thus, although the seizure of the vehicle is justified, the subsequent inventory search, lacking in probable cause, cannot be arbitrary and must be performed according to uniform procedures.[5]
Delaware v Prouse (440 US 648 [1979]) supports this rationale and emphasizes the distinction between police actions based on the presence or absence of probable cause. There, the United States Supreme Court invalidated random police stops conducted for vehicle license and registration checks. This type of police intrusion obviously had no probable cause justification. As our dissenting colleagues correctly point out, the Supreme Court was concerned that "`[t]his kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed'" (dissenting opn at 362 [quoting Delaware v Prouse, supra, at 661]). The dissent seems to ignore, however, that the Supreme Court also recognized that in contrast to random, suspicionless searches, the decision to stop a vehicle is reasonable where the police have probable cause to believe that a traffic infraction has occurred (id., at 659). The Prouse Court expressly distinguished a random stop from one based on circumstances where, as here, probable cause exists "to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations" (id., at 661; see also, United States v Brignoni-Ponce, 422 US 873, 882-884 [1975] [disallowing roving patrol stops]).
The other cases relied upon by the dissent are equally inapposite. Each expresses constitutional disapproval of *355 arbitrary conduct in the context of administrative or inventory searches, where probable cause is not in play (see, e.g., Florida v Wells, supra, 495 US, at 4; New York v Burger, 482 US 691, 716-717 n 27 [1987]; Colorado v Bertine, 479 US 367, 372 [1987]; see also, People v Galak, supra). A unanimous Supreme Court in Whren noted that "only an undiscerning reader would regard these cases as endorsing the principle that ulterior motives can invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred" (supra, 517 US, at 811).
The dissenters concede that with "respect to warrantless arrests for violations of the State's criminal laws (rather than its traffic code), an individualized determination of probable cause will generally provide an objective evidentiary floor circumscribing police conduct" and thereby prevent the arbitrary exercise of search and seizure power (dissenting opn at 363). However, in the context of traffic code violations, the dissent claims that "the existence of probable cause that the infraction was committed is manifestly insufficient to protect against arbitrary police conduct" (id.). The dissenters assert that because motor vehicle travel is so much a part of our lives and is minutely regulated, total compliance with the law is impossible. We see no basis for this differentiation. While New Yorkers may ubiquitously disobey parts of the Vehicle and Traffic Law, that does not render its commands unenforceable. As noted by the unanimous United States Supreme Court, "we are aware of no principle that would allow us to decide at what point a code of law becomes so expansive and so commonly violated that infraction itself can no longer be the ordinary measure of the lawfulness of enforcement" (Whren, supra, 517 US, at 818).
Because the Vehicle and Traffic Law provides an objective grid upon which to measure probable cause, a stop based on that standard is not arbitrary in the context of constitutional search and seizure jurisprudence. Contrary to the dissent's view, probable cause stops are not based on the discretion of police officers. They are based on violations of law. An officer may choose to stop someone for a "minor" violation after considering a number of factors, including traffic and weather conditions, but the officer's authority to stop a vehicle is circumscribed by the requirement of a violation of a duly enacted law. In other words, it is the violation of a statute that both triggers the officer's authority to make the stop and limits the officer's discretion. We agree with Whren that the test used *356 by the dissenters would unduly restrict police from enforcing laws that the Legislature has seen fit to impose on individuals for the privilege of driving in this State (see, Vehicle and Traffic Law § 1101 ["It is unlawful and * * * it is a traffic infraction for any person to do any act forbidden or fail to perform any act required in this title"]).
The dissent also raises the spectre of "repeatedly documented" racial profiling in the search and seizure context. There is no claim in any of the three cases before us that the police officers engaged in racial profiling. But, if racial profiling is the analytical pivot of our colleagues' dissent, their remedy misses the mark. The dissenters' "reasonable police officer" standard does little to combat or reduce the likelihood of racially motivated traffic stops, since, in their view, an officer's primary motivation is irrelevant (see, dissenting opn at 368-369).
We conclude, for a number of reasons, that the "reasonable police officer" test should not be followed. The dissenters maintain that under the "reasonable police officer" test, prosecution of a traffic violation would be appropriate even if the stop were pretextual and the other evidence suppressed. They assert a "dearth" of cases in which pretextual stops reviewed in court decisions nationwide involved dismissal of the underlying traffic violations supporting the stops (see, dissenting opn at 374).[6]
The dissenters contend, however, that a stop of a vehicle is arbitrary (i.e., unlawful) if a "reasonable police officer" with traffic enforcement responsibilities would not have made the stop (see, dissenting opn, at 371-372). We do not see how, in the context before us, a court may separate the fruits of a stop (often a gun or drugs) from the supposed illegality of the stop itself. It would seem that if the stop is arbitrary and, therefore, unlawful, it must be so for all purposes. In the name of protecting the rights of New Yorkers, the dissenters' result would be *357 all too ironic: A police officer could "arbitrarily" stop someone for speeding and the stop would be valid, but a gun seen in plain view in the car during the stop would be suppressed as unlawfully seized.
Finally, we note that no state court employs the "reasonable police officer" test advocated by the dissenters (see, Appendix). Moreover, even before the Supreme Court decided Whren, most Federal Courts of Appeals had adopted its rationale. In so doing, many had expressly considered and rejected the "reasonable police officer" standard. Notably, in United States v Scopo, the Second Circuit held that "the fact that an officer may be engaged in an arrest which would not usually be effected in the course of the officer's normal duties does not negate the validity of the arrest" (19 F3d 777, 783 [1994]).[7] Most instructively, the Tenth Circuitone of the few circuits that fully adopted the "reasonable police officer" standardhad overruled itself and adopted the Whren rationale even before the Supreme Court decided Whren (see, United States v Botero-Ospina, 71 F3d 783, 786-787 [1995]). After applying the "reasonable police officer" standard for seven years, the court found it "unworkable" because its application produced "inconsistent and sporadic" results (id., at 786). In light of the Tenth Circuit's documented experience, we are further convinced that this standard will lead to equally unsatisfying results in New York.
The invention of the automobile has changed the fabric of American life. While the vast majority of New Yorkers own or drive vehicles, the frequency of their time on the road cannot recast the functional parameters of the Fourth Amendment or article I, § 12. We agree with Whren that the reasonable officer standard would result in inappropriate selective enforcement *358 of traffic laws. How is a court to know which laws to enforce? This test has been rejected by all nine members of the United States Supreme Court and is not utilized by any state in the union. We are simply not free to pick and choose which laws deserve our adherence. If a statute improperly impairs our constitutional liberties, whatever the source, there is a remedy.
We are not confounded by the proposition that police officers must exercise their discretion on a daily basis. Nor are we surprised at the assertion that many New Yorkers often violate some provision of the Vehicle and Traffic Law. But we cannot equate the combination of police officer discretion and numerous traffic violations as arbitrary police conduct that the Supreme Court in Delaware v Prouse viewed as evil. That conduct violates the Fourth Amendment because it was "standardless and unconstrained" (id., at 661). In the cases before us, however, we confirm a standard that constrains police conductprobable cause under the Vehicle and Traffic Law and its related regulations that govern the safe use of our highways.
Accordingly, in People v Robinson and People v Glenn, the orders of the Appellate Division should be affirmed. In People v Reynolds, the order of the Monroe County Court should be reversed, defendant's motion to suppress denied, the accusatory instruments reinstated and the case remitted to Rochester City Court for further proceedings in accordance with this opinion.

Appendix

State Courts Approving Whren or Approving Identical Police Conduct

FOLLOWS WHREN

Holland v State (696 So 2d 757, 760 [Fla 1997] [accepting Whren as authoritative interpretation of Florida Constitution's corollary to Fourth Amendment]); State v Karg (2001 Del Super LEXIS 186, 2001 WL 660014 [Del Super Ct, May 31, 2001] [explicitly holding Delaware Constitution requires Whren objective test]); City of Fargo v Sivertson (571 NW2d 137, 141 [ND 1997]); State v Bolduc (722 A2d 44, 45 [Me 1998] [explicitly approving Whren's rejection of reasonable officer test]); Commonwealth v Murdough (428 Mass 760, 762-763, 704 NE2d 1184, 1186 [1999] [adopting Whren objective standard under Massachusetts Constitution]); Gama v State (112 Nev 833, *359 836-837, 920 P2d 1010, 1012-1013 [1996] [citing Whren as basis to overrule prior cases (see, e.g., Alejandre v State, 111 Nev 1235, 903 P2d 794 [1995]) that had adopted a motivation-based standard under Nevada Constitution]); State v McBreairty (142 NH 12, 15, 697 A2d 495, 497 [1997] [adopting Whren objective test under New Hampshire Constitution]); State v McClendon (350 NC 630, 635-636, 517 SE2d 128, 132 [1999] [adopting Whren objective standard under North Carolina Constitution]); State ex rel. Dept. of Pub. Safety v 1985 Chevrolet Blazer (994 P2d 1183, 1186 [Okla Ct Civ App 1999]); State v Bjerke (697 A2d 1069, 1073 [RI 1997] [declining to depart under Rhode Island Constitution from Whren objective standard]); State v Farabee (302 Mont 29, 37-38, 22 P3d 175, 181 [2000] [adopting Whren objective standard under Montana Constitution]); State v Bartholomew (258 Neb 174, 179, 602 NW2d 510, 514 [1999] [adopting Whren objective standard under Nebraska Constitution]); State v Dickey (152 NJ 468, 479-480, 706 A2d 180, 186 [1998]); State v Nelson (336 SC 186, 194-195, 519 SE2d 786, 790 [1999]); Walter v State (28 SW3d 538 [Tex Ct Crim App 2000]); Muscatell v Cline (196 W Va 588, 597, 474 SE2d 518, 527 [1996] [adopting Whren objective standard under West Virginia Constitution]).

CITES WHREN WITH APPROVAL

State v Ossana (199 Ariz 459, 461, 18 P3d 1258, 1260 [2001]); People v Valenzuela (74 Cal App 4th 1202, 1207, 88 Cal Rptr 2d 707, 711 [Ct App 1999]); People v Ingram (984 P2d 597, 603 [Colo 1999] [en banc]); Karamychev v District of Columbia (772 A2d 806, 813 n 9 [DC 2001]); People v Rucker (294 Ill App 3d 218, 224, 689 NE2d 1203, 1208 [1998]); State v Predka (555 NW2d 202, 205-206 [Iowa 1996]); State v Hardyway (264 Kan 451, 456, 958 P2d 618, 622 [1998]); Wilson v Commonwealth (37 SW3d 745, 749 [Ky 2001]); State v Waters (780 So 2d 1053, 1056 [La 2001]); Wilkes v State (364 Md 554, 572, 774 A2d 420, 430-431 [2001]); People v Kazmierczak (461 Mich 411, 419 n 8, 605 NW2d 667, 672 n 8 [2000]); State v Battleson (567 NW2d 69, 71 [Minn Ct App 1997]); Guerrero v State (746 So 2d 940, 943 [Miss Ct App 1999]); State v Lane (937 SW2d 721, 723 [Mo 1997]); State v Martinez (123 NM 405, 409, 940 P2d 1200, 1204 [1997]); Commonwealth v Hoak (700 A2d 1263, 1268 [Pa Super Ct 1997], affd by an evenly divided court 557 Pa 496, 734 A2d 1275 [1999]); State v Trudeau (165 Vt 355, 359 n 3, 683 A2d 725, 728 n 3 [1996]); State v Rutzinski (241 Wis 729, 736, 623 NW2d 516, 520 [2001] [adopting Whren objective standard under Wisconsin Constitution]).
*360 HAS WHREN ANALYSIS WITHOUT CITING WHREN
Beauvois v State (837 P2d 1118, 1121 n 1 [Alaska Ct App 1992]); State v Bolosan (78 Haw 86, 94, 890 P2d 673, 681 [1995] [applying under Hawaii Constitution an objective standard later articulated by Whren]); State v Myers (118 Idaho 608, 798 P2d 453, 455 [1990]); Mitchell v State (745 NE2d 775, 787 [Ind 2001] [adopting Whren standard under Indiana Constitution]); City of Dayton v Erickson (76 Ohio St 3d 3, 6, 665 NE2d 1091, 1094 [1996] [adopting objective standard under Ohio Constitution]); State v Carter (287 Ore 479, 485, 600 P2d 873, 875 [1979]); State v Lopez (873 P2d 1127, 1140 [Utah 1994] [declining to depart from Whren's interpretation of Fourth Amendment in construing parallel provisions of Utah Constitution]); Glasco v Commonwealth (257 Va 433, 448, 513 SE2d 137, 146 [1999]); State v Welch (873 P2d 601 [Wyo 1994]).
LEVINE, J. (dissenting).
At issue here is the validity of pretextual traffic stops, that is, the seizure of a vehicle, ostensibly for an actual Vehicle and Traffic Law violation, but in reality effected only because of the officer's determination to conduct an otherwise unauthorized investigation of suspected criminal activity (see, 1 LaFave, Search and Seizure § 1.4 [e], at 119-120 [3d ed]).
In our view, Whren v United States (517 US 806) inadequately protects a core value of both the Fourth Amendment and this State's counterpart, New York Constitution, article I, § 12, in permitting arbitrary exercises of discretion on the part of police officers to conduct investigative stops of vehicles on the pretext of pursuing violations of the Vehicle and Traffic Law. Therefore, Whren should not be followed as a matter of State constitutional law.

I.
We believe it beyond debate that two equally fundamental norms animated adoption of the Fourth Amendment and were embedded in the search and seizure jurisprudence of the Supreme Court and this Court. The first was that persons and their houses, papers and effects were not to be subjected to unjustified searches and seizures; hence, the requirement that "no Warrants shall issue, but upon probable cause" (US Const Amend IV; NY Const, art I, § 12). The second was that the "right of the people" must also be protected against the arbitrary exercise of the search and seizure powermost concretely embodied in the mandate that a warrant not only be supported *361 by probable cause, but also "particularly describ[e]" the places, persons or things to be seized or searched (US Const Amend IV; NY Const, art I, § 12).
In his 1974 Holmes lecture Perspectives on the Fourth Amendment (58 Minn L Rev 349, 410-412), Professor Anthony G. Amsterdam explained that the Framers' intent was to prohibit a two-fold indiscriminateness characteristic of the colonial general warrants and writs of assistance. Their evils were:
"[F]irst * * * that they expose people and their possessions to interferences by government when there is no good reason to do so. The concern here is against unjustified searches and seizures * * *. [S]econd is that indiscriminate searches and seizures are conducted at the discretion of executive officials, who may act despotically and capriciously in the exercise of the power to search and seize. This latter concern runs against arbitrary searches and seizures: it condemns the petty tyranny of unregulated rummagers" (id., at 411 [emphasis in original]).[1]
The modern Fourth Amendment jurisprudence of the Supreme Court expressly recognizes the centrality of the second function of the Fourth Amendment: to safeguard against arbitrarily exercised personal and property intrusions. Thus, in Wolf v Colorado (338 US 25, overruled on other grounds by Mapp v Ohio, 367 US 643), where the Fourth Amendment was first imposed upon the States by incorporation into the Fourteenth Amendment's Due Process Clause, the Court stated: "The security of one's privacy against arbitrary intrusion by the policewhich is at the core of the Fourth Amendmentis basic to a free society" (id., at 27 [emphasis supplied]).
In Camara v Municipal Ct. (387 US 523, 528), the Court repeated: "[t]he basic purpose of [the Fourth] Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials" (emphasis supplied). In Camara, the Court struck warrantless nonemergency administrative housing code inspections on the principal ground that *362 "[t]he practical effect of this system is to leave the occupant subject to the discretion of the official in the field" (id., at 532 [emphasis supplied]).
In a series of decisions dealing with various configurations of vehicle stops on the public highways, the Supreme Court repeatedly emphasized the critical concern of whether the police procedures at issue subjected motorists "to potentially unlimited interference with their use of the highways, solely at the discretion of * * * officers" (United States v Brignoni-Ponce, 422 US 873, 882 [emphasis supplied]). Thus, in Delaware v Prouse (440 US 648), the Court held that random police stops for license and registration checks violated the Fourth Amendment. The Court emphasized that "[t]his kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed" (id., at 661 [emphasis supplied]).
This Court, in applying the identical language of the first paragraph of article I, § 12 of the State Constitution, has afforded citizens even greater protections in order to fulfill the underlying constitutional purpose of preventing not only unsupported searches and seizures, but also the arbitrary exercise of lawful authority to seize or search. As noted in a comprehensive study of State constitutional search and seizure jurisprudence, "New York decisions are guided by the general constitutional policy reflected by Article one, Section twelve rather than the literal meaning of the constitutional language. That policy is to guarantee personal privacy, bodily integrity, property interests and freedom of movement against arbitrary and unjustified intrusions in the nature of searches and seizures by the government" (Pitler, Independent State Search and Seizure Constitutionalism: The New York State Court of Appeals' Quest for Principled Decisionmaking, 62 Brook L Rev 1, 282-283 [emphasis supplied; footnotes omitted]).
In the context of automobile searches and seizures, we have held that "the State Constitution protects the privacy interests of the people of our State * * * against the unfettered discretion of government officials to search or seize" (People v Belton, 55 NY2d 49, 52 [emphasis supplied]). And in People v Galak (80 NY2d 715) we invalidated an inventory search of a vehicle and suppressed its fruits, under both the Fourth Amendment and article I, § 12, because "[t]he police department policy governing the search failed to generate a meaningful inventory of the vehicle's contents and allowed the officer conducting the search undue discretion" (id., at 716-717 [emphasis supplied]).

*363 II.
The majority, following the Supreme Court's decision in Whren, concludes that even an admittedly pretextual traffic stop meets State constitutional standards if the officer had probable cause to believe the traffic code had been violated. Concededly, the first prophylactic purpose of both Federal and State constitutional search and seizure provisionsto prevent unjustified governmental invasions of personal liberty and privacyis satisfied when a traffic stop is based upon probable cause that an infraction was committed. Moreover, with respect to warrantless arrests for violations of the State's criminal laws (rather than its traffic code), an individualized determination of probable cause will generally provide an objective evidentiary floor circumscribing police conduct, thereby satisfying the second purpose of the Fourth Amendment and article I, § 12the prevention of arbitrary exercises of governmental authority to search or seize.
Yet in the context of pretextual traffic stopstraffic infraction stops that would not have been made but for the aim of the police to accomplish an otherwise unlawful investigative seizure or searchthe existence of probable cause that the infraction was committed is manifestly insufficient to protect against arbitrary police conduct. That is so for two reasons. First, motor vehicle travel is one of the most ubiquitous activities in which Americans engage outside the home.[2] Second, it is, by an overwhelming margin, the most pervasively regulated activity engaged in by Americans. Because virtually every aspect of the operation and equipping of motor vehicles is codified, the Whren petitioners' assertionthat "[s]ince * * * the use of automobiles is so heavily and minutely regulated that total compliance with traffic and safety rules is nearly impossible, a police officer will almost invariably be able to catch any given motorist in a technical violation"was so self-evidently true that it went unchallenged (Whren v United States, supra, 517 US, at 810).
The confluence of the foregoing factorsthe dependency of the vast majority of Americans upon private automobile *364 transportation and the virtual impossibility of sustained total compliance with the traffic lawsgives the police wide discretion to engage in investigative seizures, only superficially checked by the probable cause requirement for the traffic infraction that is the ostensible predicate for the stop. The Whren Court did not address the fact that arbitrary investigative seizuresin violation of a core value of the Federal and State search and seizure constitutional orderare permitted if pretextual stops can be justified solely on the basis of the existence of probable cause to issue a traffic infraction ticket.
Sadly, the pretext stop decisions in lower State and Federal courts confirm that the traffic infraction probable cause standard has left the police with the ability to stop vehicles at will for illegitimate investigative purposes. Typically, the stops are conducted as part of a drug interdiction program by a law enforcement agency. The vehicle and occupants appear to fit within a "drug courier" profile and the driver or occupants may have engaged in some other innocuous behavior which arouses a surmise of criminal conduct. The officer then follows the vehicle until some traffic code violation is observed. At that point, or even later, the vehicle is pulled over and the officer proceeds with the investigation. All occupants may be directed to exit the vehicle (see, Maryland v Wilson, 519 US 408; People v Carvey, 89 NY2d 707); the driver also may be interrogated and asked to consent to a search of the vehicle.
That pattern was reflected in United States v Smith (80 F3d 215 [7th Cir]), in which the suspected drug courier was followed for 0.7 miles and then stopped for an air freshener hanging from the vehicle's rearview mirror. In United States v Miller (821 F2d 546, 547 [11th Cir]), the officer's suspicions were aroused because the car was being driven "overly cautious"; ultimately, the stop was made for crossing over the white painted lane marker by four inches during an interval of 6.5 seconds. In United States v Hill (195 F3d 258, 261 [6th Cir], cert denied 528 US 1176), a sheriff's deputy decided to follow a U-Haul truck driven completely lawfully "because it was a U-Haul, and because it had been his experience that U-Hauls carry narcotics," until, after almost a mile, a speeding violation was detected. The Fifth Circuit, in United States v Roberson (6 F3d 1088, 1092, cert denied 510 US 1204, sub nom. Keeper v United States, 511 US 1010, sub nom. Whitlock v United States, 510 US 1182), described the career of the arresting officer in that case as follows:

*365 "It appears that in the past five years, Trooper Washington has arrested 250 people on drug charges, all after traffic stops. Of those, only four were warrant-authorized. Indeed, this court has become familiar with Trooper Washington's propensity for patroling the fourth amendment's outer frontier."
In Roberson, the trooper, pursuing a speeder, passed the defendants' van, which displayed out-of-state license plates and was occupied by four African Americans. Abandoning the pursuit of the other car, the trooper crested a hill, pulled onto the shoulder of the highway, doused his lights and activated his radar gun as the van approached. The van was found to be traveling only three miles per hour over the speed limit. However, in changing lanes to avoid the risk of contact with the trooper's car, the driver failed to signal, although the van was "apparently the only moving vehicle on that stretch of road" (id., at 1089). The trooper made the stop for that infraction. The drug possession conviction in Roberson was upheld on the ground that the officer had probable cause for the failure-to-signal infraction.
New York pretext stop cases reveal the same pattern. For example, in People v Laws (213 AD2d 226, lv denied 85 NY2d 975), the defendant's vehicle was observed parked in front of a suspected "narcotics location," and was subsequently pulled over for a broken taillight (see also, People v Young, 241 AD2d 690 [driver stopped by plainclothes State Police investigator for failure to signal]; People v Letts, 180 AD2d 931, appeal dismissed 81 NY2d 833 [driver stopped by plainclothes State Police investigator for failure to come to a complete stop at a stop sign]).
The impact of the Whren standard cannot be overstated:
"With automobiles serving as the common denominator in our society, probable cause, reasonable suspicion, and other Fourth Amendment-type safeguards have, for all practical purposes, disappeared from large parts of our public and private lives. Thus no matter how incremental the legal changes brought about by each car case ha[ve] been, the big picture has been altered, and dramatically so. And this affects the lives of all Americans not just those who are stopped frequently, but every person who could be" (Harris, Car Wars: The Fourth Amendment's Death on the Highway, supra, 66 Geo Wash L Rev, at 577-578).
*366 Indeed, even one member of the unanimous Whren Court has belatedly recognized that Whren's endowment of the police with unlimited power to conduct vehicle stops, when combined with the further authority to order all occupants to exit the vehicles, substantially impacts the personal liberty and privacy of myriad citizens, most of whom will be innocent of any criminal conduct:
"The practical effect of our holding in Whren, of course, is to allow the police to stop vehicles in almost countless circumstances. When Whren is coupled with today's holding, the Court puts tens of millions of passengers at risk of arbitrary control by the police" (Maryland v Wilson, supra, 519 US, at 423 [Kennedy, J., dissenting]).
Moreover, as has been repeatedly documented, and as the majority acknowledges, drug courier interdiction through traffic infraction stops has a dramatically disproportionate impact on young African-American males (see, Harris, Car Wars: The Fourth Amendment's Death on the Highway, supra; Abramovsky and Edelstein, Pretext Stops and Racial Profiling After Whren v. United States: The New York and New Jersey Responses Compared, 63 Alb L Rev 725; Harris, "Driving While Black" and All Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops, 87 J Crim L & Criminology 544; Maclin, Race and the Fourth Amendment, 51 Vand L Rev 333; Sklansky, Traffic Stops, Minority Motorists, and the Future of the Fourth Amendment, 1997 Sup Ct Rev 271). Yet both the majority and the Whren Court dismiss the relevance of such disparate treatment in the constitutional search and seizure context. They instead suggest that the remedy lies in invoking the Federal Constitution's Equal Protection Clause. The same studies that recognize the existence of a disparate racial impact, however, also demonstrate the inadequacy of the Equal Protection Clause as a remedy for those abuses. A "racial profiling claim under the Equal Protection Clause is difficult, if not impossible, to prove" (Beck and Daly, State Constitutional Analysis of Pretext Stops: Racial Profiling and Public Policy Concerns, 72 Temp L Rev 597, 612 [1999]). The Equal Protection Clause prohibits race-based selective enforcement of the law only when such enforcement "`had a discriminatory effect and * * * was motivated by a discriminatory purpose'" (United States v Armstrong, 517 US 456, 465). Of course, "[i]t is easy for an accused to allege that she was subjected to police interference based on race, but it is difficult to support the allegation" (Beck and Daly, supra, at 612).
*367 Moreover, the problems of proof in establishing an equal protection claim may be all but insurmountable. Putting aside the unquestionably expensive and time-consuming process of assembling statistical evidence, it is debatable whether the requisite data would even be available (see, Beck and Daly, supra, at 613). Supreme Court precedent also suggests that minority motorists alleging that a pretextual traffic stop constituted a denial of equal protection must show that similarly situated white motorists could have been stopped, but were not (see, United States v Armstrong, supra, 517 US, at 465; see also, Davis, Race, Cops, and Traffic Stops, 51 U Miami L Rev 425, 437-438). These hardly show that equal protection challenges constitute a viable remedy for the disparate racial impact of pretextual traffic stops.

III.
While practical considerations may favor State-Federal uniformity in setting constitutional standards governing law enforcement practices, we have stressed in the past that this is only one factor to be considered with others that may point in a different direction. "When weighed against the ability to protect fundamental constitutional rights, the practical need for uniformity can seldom be a decisive factor" (People v P. J. Video, 68 NY2d 296, 304, cert denied 479 US 1091). We have not hesitated to deviate from Federal Fourth Amendment jurisprudence when we have concluded that it does not adequately secure the fundamental rights of privacy under article I, § 12 of our own Constitution (see, People v Scott, 79 NY2d 474; People v Keta, 79 NY2d 474, 491; People v Dunn, 77 NY2d 19, cert denied 501 US 1219), or when changing Federal standards undermine the "aims of predictability and precision in judicial review of search and seizure cases and the protection of the individual rights of our citizens" (People v Johnson, 66 NY2d 398, 407; see also, People v Griminger, 71 NY2d 635). Especially pertinent here, we have found reason to impose stricter requirements under our own Constitution in search and seizure cases involving automobiles and their occupants (see, People v Torres, 74 NY2d 224; People v Class, 67 NY2d 431).
We conclude that various factors strongly weigh against adopting Whren and in favor of imposing a stricter standard as a matter of State constitutional law in cases involving pretextual traffic stops.
First, while we have not directly held that the fruits of a pretextual stop should be suppressed, on no less than six occasions, *368 most of which involved automobile searches or seizures, our Court "has voiced disapproval of, and appears to have enunciated principles to address, pretextual police conduct" (Pitler, supra, 62 Brook L Rev, at 283; see, People v Spencer, 84 NY2d 749, 753, cert denied 516 US 905; People v Woods, 64 NY2d 736, 737; People v Gonzalez, 62 NY2d 386, 391; People v Prochilo, 41 NY2d 759, 761-762; People v Hansen, 38 NY2d 17, 21, overruled on other grounds by People v Ponder, 54 NY2d 160; People v Troiano, 35 NY2d 476, 477). Additionally, for over two decades Appellate Division case law has directly condemned pretextual traffic stops (see, e.g., People v Flanagan, 56 AD2d 658) and that position was ultimately adopted by all four Departments before Whren was handed down (see, e.g., People v Ynoa, 223 AD2d 975, lv denied 87 NY2d 1027, sub nom. People v Rodriguez, 87 NY2d 1024 [3d Dept]; People v James, 217 AD2d 969 [4th Dept]; People v Vasquez, 173 AD2d 580, lv denied 78 NY2d 1130 [2d Dept]; People v Watson, 157 AD2d 476, appeal dismissed sub nom. People v Flo, 75 NY2d 966, sub nom. People v Smiley, 75 NY2d 970, lv denied 75 NY2d 971 [1st Dept]). The trial courts also followed suit (see, Kamins, New York Search & Seizure, at 373-378 nn 195-197, 199 [11th ed]). Thus, adoption of the Whren position will overturn a substantial body of New York case law denying State and local law enforcement agencies the fruits of pretextual traffic stops.
Moreover, as the Whren decision acknowledges, the Supreme Court itself previously indicated in a number of cases that pretext could be a highly significant negative factor in various Fourth Amendment contexts (see, Florida v Wells, 495 US 1, 4; New York v Burger, 482 US 691, 716-717 n 27; Colorado v Bertine, 479 US 367, 372; Colorado v Bannister, 449 US 1, 4 n 4; Abel v United States, 362 US 217, 227).
Above all, however, Whren should not be followed because it does not demonstrate that its traffic infraction probable cause standard adequately protects the constitutional rights of motorists on the highways from arbitrarily exercised police powers to seize and search. Most of the Whren decision is devoted to showing why the Court rejected the standard advocated by the petitioners in that case. They had urged the adoption of an objective standard by which to judge police exploitation of arbitrary traffic code enforcement to conduct investigative stops: whether a reasonable police officer, under the circumstances, would have made the stop for the reasons given. Despite the objective nature of that test, the Supreme Court's primary *369 reason for rejecting it was that it was "driven by subjective considerations"that is, the improper motivation of the seizing officer to conduct an otherwise unjustified investigative stop (517 US, at 814). Therefore, the Court concluded, the petitioners' standard conflicted with a body of search and seizure jurisprudence holding that an officer's state of mind is irrelevant if the objective circumstances show that the officer's conduct was reasonable.
This criticism, in our view, misses the mark. The petitioners in Whren claimed that the officers' seizure was unreasonable because it was arbitrary, not because it was either unjustified or improperly motivated. They suggested that the determination whether the stop was in fact an arbitrary exercise of the power to enforce the traffic laws should be subject to an objective test, that is, by consideration of the stop's deviation from the norm.
The Whren petitioners' standard is indistinguishable from the objective test in Terry v Ohio (392 US 1) for determining the reasonableness of an investigative stop and frisk, or the objective test for reasonableness of a law enforcement officer's exploratory manipulation of a bus passenger's luggage in an overhead rack in Bond v United States (529 US 334). Just as the ulterior motives of the police in Terry and Bond were not dispositive, those of the seizing officers in Whren would not be decisive under the test advanced by the petitioners in that case.
The Whren Court offered only two other reasons for rejecting the test suggested by the petitioners. The first was that "police enforcement practices, even if they could be practicably assessed by a judge, vary from place to place and from time to time. We cannot accept that the search and seizure protections of the Fourth Amendment are so variable * * * and can be made to turn upon such trivialities" (517 US, at 815). Under well-established Federal and State search and seizure doctrine, however, the validity of a search may indeed turn upon differences in police practices from one jurisdiction to another. Thus, as already discussed, whether a vehicle inventory search is upheld may depend on the adoption by the local police agency of rules limiting the discretion of the officer in conducting such searches (see, People v Galak, supra, 80 NY2d 715; South Dakota v Opperman, 428 US 364). Moreover, the basic determination of reasonable suspicion or even probable cause to support a search or seizure will almost always "vary from place to place and from time to time," depending on the particular circumstances confronting an officer.
*370 Whren also claimed in substance that accepting petitioners' position would place Judges in the role of deciding what traffic code provisions are to be enforced at all:
"But we are aware of no principle that would allow us to decide at what point a code of law becomes so expansive and so commonly violated that infraction itself can no longer be the ordinary measure of the lawfulness of enforcement" (517 US, at 818).
Adoption of the standard urged by the petitioners in Whren would do nothing of the sort. It does nothing more than set an objective standard, the violation of which would deprive law enforcement officers only of the use of evidence of crimes unrelated to the traffic infraction obtained in investigative stops effected through arbitrary enforcement of the traffic laws. As to the infraction itself, as with criminal investigations, the probable cause standard basically works adequately to satisfy both of the dual purposes of constitutional search and seizure law for officers solely pursuing violations while authentically engaged in traffic code enforcement. In those situations, prosecution of the underlying traffic infraction is not based upon evidence obtained through exploitation of the initial stop, but upon observations made before the stop. We find it noteworthy that of the manifold pretextual stops reviewed in the decisions in Federal and state courts nationwide, none directly addressed suppression of the prosecution of the traffic violation that supported the stop.
The pretext stop cases also demonstrate that the existence of probable cause with respect to the traffic infraction is not sufficient to forestall arbitrary exploitation of the violation in order to conduct otherwise unjustified investigative stops. It is the failure of Whren even to address that issue that is the most cogent reason for not following it. It is not without significance that Whren has been the subject of a plethora of criticism in texts and articles, expressing concern that the decision marked the removal of the protection of the Fourth Amendment from the highways. Reading them, one would be hard put to agree with the Whren Court that if a heightened standard of scrutiny of pretextual stops were adopted, enforcement of the Fourth Amendment would be "made to turn upon * * * trivialities" (id., at 815), and that Whren itself was "surely" nothing more than a "run-of-the-mine case" (id., at 819). Citations to those critiques are set forth in an Appendix to this writing.
*371 IV.
Next to be addressed on these appeals is the standard we would adopt to determine whether the stops in these cases were pretextual and, thus, in violation of defendants' State constitutional rights to be free from arbitrary invasions of their liberty and privacy.
Defendants urge that we adopt a subjective test, whether the "primary motivation" for the stop was to investigate criminal activity rather than to prosecute the traffic offense ostensibly justifying the seizure.[3] We would reject that test in favor of a more objective standard, for several reasons. First, courts and commentators have noted the difficulty, if not futility, of basing the constitutional validity of searches or seizures on judicial determinations of the subjective motivation of police officers. As stated by Justice White, "sending state and federal courts on an expedition into the minds of police officers would produce a grave and fruitless misallocation of judicial resources" (Massachusetts v Painten, 389 US 560, 565 [White, J., dissenting]; see also, Amsterdam, supra, 58 Minn L Rev, at 436-437; 1 LaFave, supra, § 1.4 [e], at 124). Second, even if one could accurately discern a seizing officer's subjective motives, the resulting adjudication might not at all correlate with the constitutional objective at issue, to prevent exercises of the power to search or seize that are unreasonable in the sense of being arbitrary, standardless and inconsistent.
Thus, we prefer an objective standard similar to that adopted by the Ninth and Eleventh Circuits before Whren and urged by the petitioners in Whren itself.[4] That is, would a reasonable officer *372 assigned to Vehicle and Traffic Law enforcement in the seizing officer's department have made the stop under the circumstances presented, absent a purpose to investigate serious criminal activity of the vehicle's occupants. Whether the stop was carried out in accordance with standard procedures of the officer's department would be a highly relevant inquiry in that regard (see, 1 LaFave, supra, at 124).
In People v Robinson and People v Glenn, the courts below erred in applying the traffic violation/probable cause standard of Whren to uphold the seizures of evidence in those cases. In People v Reynolds, the courts below erred in applying essentially a primary motivation standard to suppress evidence acquired through the stop. Thus, we would reverse in all three cases and remit in each to the trial court to reopen the hearing and decide the suppression motion under the constitutionally appropriate standard.
Before concluding, we respond to the discussion of this dissent in the majority writing. The majority contends that we have "no valid basis * * * to bifurcate" examination of probable cause to believe a traffic infraction occurred and of the arbitrariness of a pretextual stop because "[p]robable cause * * * has been equated with the sum of the requirements of the State and Federal Constitutions in this area" (majority opn at 353). Thus, to the majority, the existence of probable cause to stop for a traffic code violation would preclude any inquiry into *373 whether the stop nonetheless was unreasonable as an arbitrary seizure for unjustified investigative purposes.
The "basis" for our contrary position lies, first, in the language of the Federal and State constitutional provisions. As we have noted, even in the most presumptively valid exercise of the search and seizure powerunder a search warrant probable cause to support that exercise is not enough. The warrant must also contain restrictive language "particularly describing" the persons, places and things to be seized or searched. That clause would be excised under the majority's thesis that the existence of probable cause satisfies all constitutional requirements. Preeminent scholars cite that text and the constitutional history to contradict the majority's conclusion that probable cause equates with the constitutional validity of a search or seizure: Thus, Professor Amsterdam stated that "even when there is sufficient cause to intrude upon an individual * * * the framers decreed that it was unreasonable * * * to subject his premises or possessions to indiscriminate [i.e., arbitrary] seizure" (supra, 58 Minn L Rev, at 411 [emphasis supplied]; see, 1 LaFave, Search and Seizure § 1.4 [e], at 119-122, and 2002 Pocket Part, at 16, supra).
Treating as a concession our statement that for criminal law violations the probable cause standard generally will prevent arbitrary seizures, the majority argues that our contrary conclusion respecting traffic stops lacks any basis (majority opn at 355). The distinction is based on both principle and cold fact. As we have documented, a persevering police officer, armed only with a copy of the Vehicle and Traffic Law and bent on subjecting a vehicle and its occupants to an unjustified investigative stop, will ultimately be able to accomplish that objective virtually at will. As the Appendix to this writing shows, the research of numerous legal scholars confirms that reality. Candid officers, aware of their power under a probable cause/traffic infraction standard, freely admit to it (see, Harris, supra, 66 Geo Wash L Rev, at 567-568).
The majority assures us, however, that such abuses can be cured or mitigated by judicial control over the "scope, duration and intensity of the seizure" and any subsequent search (majority opn at 353). Our case law permits the stopping officer, among other things, to open the passenger door; make outside visual inspections, including shining a flashlight into the interior of the vehicle; order the driver and all occupants out; and detain the vehicle and its occupants for purposes of verification of license, registration and insurance information *374 (see, Kamins, New York Search & Seizure, supra, at 382-384, 390-392). These are severe, and mostly standardless intrusions upon the liberty of motorists and their passengers, which are already authorized upon a stop for even a minor traffic violation, and which no amount of subsequent judicial regulation will prevent. As Justice Kennedy later observed, those intrusions can be imposed arbitrarily under the Whren standard upon "tens of millions" of highway users (519 US, at 423).
The remainder of the majority's discussion of the dissenters' position here is devoted to a critique of the objective standard we would adopt for determining whether evidence seized following a pretextual traffic stop should be suppressed.
The majority's principal criticism of the reasonable police officer standard we support raises the same spectre as the Supreme Court did in Whren, that the standard will lead to piecemeal judicial abrogation of enforcement of our State's traffic code. The majority does not persuasively address our earlier analysis explaining why a standard to deny police evidence seized in arbitrary investigative stops for traffic offenses will not preclude prosecution of such offenses.
But again, experience confirms the correctness of our position. Before Whren, the holdings of Federal and State courts covering 22 states, including California, Florida and New Yorkthree of the four most populousconsistently or for a period of time held that a probable cause/traffic infraction standard was insufficient, and applied a stricter test for adjudging pretextual stops.[5] Yet there is a dearth of authority in which traffic violations have been dismissed on the ground that the stops were pretextual. To us this indicates that Whren's concern is more theoretical than real.
We remain to reverse and remit for reopened hearings with instruction to apply the appropriate objective standard by the suppression court to the traffic stops in all three of the cases before us.
In People v Robinson and People v Glenn: Order affirmed.
Judges WESLEY, ROSENBLATT and GRAFFEO concur with Judge SMITH; Judge LEVINE dissents and votes to reverse and remit *375 to Rochester City Court for a reopened suppression hearing in a separate opinion in which Chief Judge KAYE and Judge CIPARICK concur.
In People v Reynolds: Order reversed, defendant's motion to suppress denied, the accusatory instruments reinstated and the case remitted to Rochester City Court for further proceedings in accordance with the opinion herein.

Appendix
Abramovsky, Criminal Law and Procedure, Will the New York Court of Appeals Surrender to "Whren"?, NYLJ, July 19, 2000, at 3, col 1
Abramovsky and Edelstein, Pretext Stops and Racial Profiling After Whren v. United States: The New York and New Jersey Responses Compared, 63 Alb L Rev 725 (2000)
Berner, First MondayCriminal Procedure, 33 Val U L Rev 23, 25 (1998)
Dobson, The Police, Pretextual Investigatory Activity, and the Fourth Amendment: What Hath Whren Wrought?, 9 St. Thomas L Rev 707 (1997)
Donahoe, "Could Have," "Would Have:" What the Supreme Court Should Have Decided in Whren v. United States, 34 Am Crim L Rev 1193 (1997)
Harris, Car Wars: The Fourth Amendment's Death on the Highway, 66 Geo Wash L Rev 556 (1998)
Harris, "Driving While Black" and All Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops, 87 J Crim L & Criminology 544 (1997)
Harris, The Stories, the Statistics, and the Law: Why "Driving While Black" Matters, 84 Minn L Rev 265, 318 (1999)
Kamisar, Confessions, Search and Seizure and the Rehnquist Court, 34 Tulsa L J 465 (1999)
1 LaFave, Search and Seizure, A Treatise on the Fourth Amendment § 1.4 (e) (3d ed and 2002 Pocket Part)
Leary and Williams, Toward a State Constitutional Check on Police Discretion to Patrol the Fourth Amendment's Outer Frontier: A Subjective Test for Pretextual Seizures, 69 Temp L Rev 1007 (1996)
Levit, Pretextual Traffic Stops: United States v. Whren and the Death of Terry v. Ohio, 28 Loy U Chi L J 145 (1996)
Maclin, Race and the Fourth Amendment, 51 Vand L Rev 333 (1998)
*376 Markus, Whren v. United States: A Pretext to Subvert the Fourth Amendment, 14 Harv Blackletter L J 91 (1998)
Oliver, With an Evil Eye and an Unequal Hand: Pretextual Stops and Doctrinal Remedies to Racial Profiling, 74 Tul L Rev 1409 (2000)
O'Neill, Beyond Privacy, Beyond Probable Cause, Beyond the Fourth Amendment: New Strategies for Fighting Pretext Arrests, 69 U Colo L Rev 693 (1998)
Sklansky, Traffic Stops, Minority Motorists, and the Future of the Fourth Amendment, 1997 Sup Ct Rev 271
Stuntz, The Uneasy Relationship Between Criminal Procedure and Criminal Justice, 107 Yale L J 1, 67 n 229 (1997)
Thompson, Stopping the Usual Suspects: Race and the Fourth Amendment, 74 NYU L Rev 956 (1999)
Note, After Whren v. United States: Applying the Equal Protection Clause to Racially Discriminatory Enforcement of the Law, 2 Mich L & Pol'y Rev 159 (1997)
Note, Challenging Selective Enforcement of Traffic Regulations After the Disharmonic Convergence: Whren v. United States, United States v. Armstrong, and the Evolution of Police Discretion, 76 Tex L Rev 1083 (1998)
Note, "DWB (Driving While Black)" and Equal Protection: The Realities of an Unconstitutional Police Practice, 6 J L & Pol'y 291 (1997)
Note, Let He Who Never Has Turned Without Signaling Cast the First Stone: An Analysis of Whren v. United States, 24 Am J Crim L 627 (1997)
Note, Making the Best of "Whren": The Problems with Pretextual Traffic Stops and the Need for Restraint, 50 Fla L Rev 385 (1998)
Note, Whren v. United States: An Abrupt End to the Debate over Pretextual Stops, 49 Me L Rev 207 (1997)
Note, Whren v. United States: The Constitutionality of Pretextual Stops, 58 La L Rev 369 (1997)
Note, Whren v. United States and Pretextual Traffic Stops: The Supreme Court Declines to Plumb Collective Conscience of Police, 38 BC L Rev 737 (1997)
Comment, Eradicating Racial Stereotyping from Terry Stops: The Case for an Equal Protection Exclusionary Rule, 71 U Colo L Rev 255, 279 (2000)
Comment, Without a Warrant, Probable Cause, or Reasonable *377 Suspicion: Is There Any Meaning to the Fourth Amendment While Driving a Car?, 35 Hous L Rev 1683, 1706 (1999)
NOTES
[1] Only Arkansas and Washington have rejected Whren's formulation. Both of those states would assess the reasonableness of a traffic stop based on the subjective motivations of the police (see, State v Sullivan, 340 Ark 315, 318, 11 SW3d 526, 528, reh denied 16 SW3d 551 [2000], revd 532 US 769 [2001] [per curiam]; State v Ladson, 138 Wash 2d 343, 358, 979 P2d 833, 842-843 [1999]). In Sullivan, the Arkansas Supreme Court was not interpreting the Arkansas Constitution when it adopted the test of subjective intent. Rather, the Arkansas Supreme Court was interpreting the United States Constitution more broadly than the U.S. Supreme Court had in Whren. The U.S. Supreme Court reversed the Arkansas decision (see, Arkansas v Sullivan, 532 US 769 [2001]).
[2] Article I, § 12, like the Fourth Amendment, reads: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Article I, § 12 further provides: "The right of the people to be secure against unreasonable interception of telephone and telegraph communications shall not be violated, and ex parte orders or warrants shall issue only upon oath or affirmation that there is reasonable ground to believe that evidence of crime may be thus obtained, and identifying the particular means of communication, and particularly describing the person or persons whose communications are to be intercepted and the purpose thereof."
[3] See, e.g., Abraham Abramovsky and Jonathan I. Edelstein, Pretext Stops and Racial Profiling after Whren v. United States: The New York and New Jersey Responses Compared (63 Alb L Rev 725 [2000]); David A. Harris, The Stories, the Statistics, and the Law: Why "Driving While Black" Matters (84 Minn L Rev 265, 296 [1999]); Phyllis W. Beck and Patricia A. Daly, State Constitutional Analysis of Pretext Stops: Racial Profiling And Public Policy Concerns (72 Temp L Rev 597 [1999]).
[4] Article I, § 11 of the State Constitution reads: "[Equal protection of laws; discrimination in civil rights prohibited.] * * * No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state."
[5] Moreover, the dissenters' reference to the particularity requirement in search warrant cases is inapt. Even in warrantless search cases as, for example, in searches incident to arrest, there is no particularity requirement. In any event, we are not dealing here with search warrants or even with searches but with traffic stops based on particular violations of law established by probable cause.
[6] Determining the scope of a suppression court's ruling often cannot easily be gleaned from appellate decisionsreference to the record before the appellate court is often necessary. For example, in People v James (217 AD2d 969 [1995]), the Appellate Division dismissed the entire indictment based upon a pretextual stop/primary motivation analysis (see, id., at 969-970; see also, dissenting opn at 367-368). A review of the Appellate Division record and briefs in James indicates that the indictment charged the defendant with Vehicle and Traffic Law violations that the Appellate Division ultimately characterized as pretextual. It may well be that in many instances, a police officer did not issue a ticket for traffic violations after finding evidence of far more serious criminal activity. That consideration may be relevant to the credibility of the officer in justifying the stop.
[7] See also, United States v Hassan El (5 F3d 726, 729 [4th Cir 1993] [declining to adopt a test that considers departures from routine police practices]); United States v Trigg (925 F2d 1064, 1065 [7th Cir 1991] [refusing to "consider the conformance of an arrest to usual police practices in determining the reasonableness of an arrest"]); United States v Cummins (920 F2d 498, 501 [8th Cir 1990] [rejecting the "reasonable police officer" standard]).

In addition, other circuits had implicitly rejected the "reasonable police officer" standard (see, United States v Gallo, 927 F2d 815, 818-819 [5th Cir 1991]; cf. also, United States v Ferguson, 8 F3d 385, 391 [6th Cir 1993] [en banc] [applying a "would have" test, but nevertheless concluding that a "stop is reasonable if there was probable cause" and it is "irrelevant whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop"]). In United States v Harvey, the Sixth Circuit followed Ferguson even though the defendant argued that "no reasonable police officer would have stopped the car * * * absent some other motive" (16 F3d 109, 111 [1994]).
[1] The arbitrariness of the writs of assistance was denounced in a famous prerevolutionary speech by Boston patriot James Otis, in that they placed the "liberty of every man in the hands of every petty officer" (quoted in Boyd v United States, 116 US 616, 625, and Payton v New York, 445 US 573, 583 n 21).
[2] Harris, Car Wars: The Fourth Amendment's Death on the Highway (66 Geo Wash L Rev 556, 576 [1998]) observed that "America is virtually saturated with vehicles, roads, and licensed drivers." Harris cites United States Commerce Department statistics that almost 100 million Americans drive daily to work in private vehicles; virtually 9 out of 10 Americans of driving age are licensed to drive; and by 1990 only 11.5% of American households did not own at least one vehicle (id., at 576-577 and nn 138-140, 148).
[3] That standard has been applied by the lower courts in deciding pretextual stop cases (see, People v Washington, 238 AD2d 43, 50, lv denied 91 NY2d 1014). In large part, however, objective criteria have been used to determine the officers' motivations (see, id.).
[4] (See, United States v Cannon, 29 F3d 472 [9th Cir]; United States v Smith, 799 F2d 704 [11th Cir].) The Tenth Circuit in United States v Guzman (864 F2d 1512) had also adopted the reasonable police officer objective test. However, a divided Tenth Circuit en banc court in United States v Botero-Ospina (71 F3d 783, cert denied 518 US 1007) overruled Guzman and upheld pretextual traffic stops so long as the seizing officer had probable cause to believe a traffic infraction had been committed. Before the Whren decision, several State courts also employed this "reasonable officer" test as a matter of Federal constitutional law (see, e.g., Kehoe v State, 521 So 2d 1094 [Fla]; Mings v State, 318 Ark 201, 210, 884 SW2d 596, 602; State v Haskell, 645 A2d 619, 621 [Me]; Alejandre v State, 111 Nev 1235, 903 P2d 794; State v Chapin, 75 Wash App 460, 468, 879 P2d 300, 304-305, review denied 125 Wash 2d 1024, 890 P2d 465; Limonja v Commonwealth, 8 Va App 532, 538, 383 SE2d 476, 480, cert denied 495 US 905; People v Guerrieri, 194 Ill App 3d 497, 551 NE2d 767, lv denied 132 Ill 2d 549, 555 NE2d 380; see also, Simmons v State, 223 Ga App 781, 782, 479 SE2d 123, 124).

We do not quarrel with the majority's demonstration that, after Whren, most State courts adopted its probable cause/traffic infraction standard, or that, even before Whren, the prevailing view among the Federal circuits was to reject the "reasonable officer" test in favor of the probable cause test ultimately adopted in Whren. By no means was the view unanimous, however. Even in those courts that rejected the "reasonable officer" standard, Federal Judges continued to recognize the arbitrary deprivation of personal liberty that the probable cause standard permits. In Botero-Ospina (71 F3d, at 795), cited in the majority opinion (at 357), Judge Lucero, joined by Chief Judge Seymour and Judge Henry, dissented, stating: "I do not question the depth of the frustration which drives my colleagues in the majority to abandon the reasonable officer standard * * *. Nevertheless, their action will not stand the test of time, and it does not pass constitutional scrutiny today." Similarly, in United States v McCully (21 F3d 712, 714 [6th Cir], cert denied 513 US 886), Judge Jones, concurring, stated: "On the basis of [United States v Ferguson, 8 F3d 385 (cited in the majority opn at 357 n 7)], I must vote to affirm McCully's conviction. However, I continue to believe that our decision in that case represents an abdication of our duty to provide citizens the security to travel without unreasonable police stops and searches, as guaranteed by the Fourth Amendment."
[5] See cases supra at 371-372 n 4.